[Civil No. 3259.   Filed March 21, 1933.]

[19 Pac. (2d) 1063.]

In the Matter of the Estate of ARIZONA SOUTH-WEST BANK, an Arizona Corporation, Insolvent.   S. W. ELLERY, State Superintendent of Banks and Ex-Officio Receiver of Arizona Southwest Bank, Insolvent, Appellant, v. BOARD OF EDUCATION OF TUCSON HIGH SCHOOL DISTRICT, PIMA COUNTY, ARIZONA, and O. W. PATTERSON, as Principal of Tucson High School, Appellees.

Mr. John W. Ross, for Appellant.

Mr. Ben C. Hill, for Appellees.

McALISTER, J.—This is an appeal from an order of the superior court of Pima county directing the receiver of the Southwest Bank at Tucson, an insolvent, to allow and pay as a preferred instead of a general claim the sum standing to the credit of a certain account in that bank at the time it closed its doors.

The facts are not in dispute and are substantially these: On June 20, 1931, the Arizona Southwest Bank was found to be insolvent and thereupon the State Superintendent of Banks took it over for liquidation. Among the accounts it was found to be carrying at the time was one in the name of Tucson High School Summer School Fund, O. W. Patterson, Principal. The funds in that account were made up of fees of $5 each, collected from pupils who entered the 1931

session of the Tucson High School, and were paid in by them at the opening as a guarantee of their attendance with the understanding that it would be returned to them at the close of the term if they were not absent, except on account of illness, more than three times during the summer session.

Five or six years prior to June, 1931, the board of education of the Tucson High School had adopted a resolution authorizing the organization of a seven weeks' summer school to be held under rules to be prescribed by the superintendent of the high school and it was pursuant to the authority conferred by this resolution that the superintendent acted in prescribing the rule requiring each pupil to pay the fee in question. When the money was collected each year it was deposited in one of the banks of the city, the principal, Mr. Patterson, advising the bank in each instance as to the character of the fund.

Soon after the bank closed Mr. Patterson filed with the receiver a general claim for the sum of $3,029, which was approved, but in the following March he filed a second claim for the same amount, less dividends theretofore received, and asked that it be allowed as a preferred claim. At the same time he filed in the superior court of Pima county a petition praying that the court direct the receiver to allow and pay the claim as a preferred one, and upon a hearing this relief was granted, the court finding that the funds constituted "public money" and were deposited for safekeeping. It is from this order that the receiver appeals.

The first of the five errors assigned raises one of the important questions in the case and that is whether the funds on deposit were "public money," as this term is defined in paragraph 4734, Revised Code of 1928, reading as follows, it being conceded that if they were the order of the trial court is correct:

"The phrase 'public money,' as used herein, includes all bonds and evidence of indebtedness, and all money belonging to, received, or held by, the state, county, district, city or town officers, in their official capacity."

If this fund was "money belonging to, received, or held by, the . . . district . . . officers, in their official capacity" it was public money and entitled to a preference. The fee of $5 was paid by each pupil to Mr. Patterson whose sole duty relative to it was to keep it intact and return it to the pupil at the close of the term if he had not forfeited it. It was required by the principal and paid in by the pupil merely as a guarantee that the pupil would attend school during the term without being absent more than three times, unless ill or excused, and while it remained in the custody of Mr. Patterson who collected and held it merely as trustee for the pupil, neither he nor the superintendent nor the board of education owned it or any interest in it, vested or otherwise, unless the pupil defaulted in the manner prescribed, and there is nothing in the record showing that any one of the six hundred was absent more than three times during the term. The unforfeited portion of it, therefore,—and under the record this means all of it—belonged, not to the school district, but to the pupils who put it up to insure their attendance. If the principal had refused to return it to the pupil he could have been forced to do so at the suit of the latter.

It is argued, however, that, regardless of the fact that the money did not belong to the district, it was received and held by its officers in their official capacity, and that this brought it within the phrase "public money," as this term is used in paragraph 4734, *supra*. Before this may be true it must appear that the principal of the high school, Mr. Patterson, was an officer of the school district acting in his official capacity in collecting the money, or as an agent of

district officers, and that the law authorized him to demand it of each pupil as a guarantee of his attendance. It is, of course, clear that neither the superintendent nor the principal was an officer of the school district; they were merely employees who secured their positions through contracts which fixed their compensation and gave them the same right to redress that anyone else whose contract had been breached would have had. If either had been a public officer he would not have held his position by virtue of a contract, because in that event the salary would have attached to the office and been fixed without regard to the consent of the parties.

But, it is contended, the superintendent in prescribing the rule requiring the fee and the principal in collecting it pursuant thereto were acting as agents or representatives of the board of education and that this rendered it immaterial whether they themselves were officers of the district or not. This, if true at all, could be so only upon condition that the law, either expressly or impliedly, authorized the high school board to demand of each pupil a money guarantee of his attendance at the summer session. There is no contention that express power to do this has been given but it is claimed that it has been impliedly conferred and in support of this view various provisions of the Constitution and the statutes are cited. A reading of all those dealing with the public school system, however, leads to the conclusion that instruction in high as well as in common schools shall be absolutely free.

Section 6, article 11, of the Constitution directs the legislature to "provide for a system of common schools by which a free school shall be established and maintained in every school district for at least six months in each year, which school shall be open to all pupils between the ages of six and twenty-one years," and section 9 of the same article provides

that "the laws of the State shall enable cities and towns to maintain free high schools."

Section 6 of this article provides also that "the University and all other State educational institutions shall be open to students of both sexes, and the instruction furnished shall be as nearly free as possible," and it is claimed that the expressions "State educational institutions" and "as nearly free as possible," include high schools and, therefore, authorize the charge of a registration or other fee as a condition of admission. This section refers specifically to the University and there is no question but that it includes normal schools, but it is immaterial whether high schools also are "institutions" within the meaning of this term as here used, because, even though they are, the legislature has not by any act to which our attention has been called shown that it recognized this to be true, for nowhere in the statute are trustees authorized or given the power to collect funds for the support of high schools in their districts, except a small tuition fee from nonresidents, or to require the payment of money by the pupils of their districts, for any purpose. Their only duty relative to the raising of revenue is to prepare an itemized statement of the amounts needed for the ensuing year and file it with the county school superintendent who in turn transmits it, along with his estimate for all the county schools, to the boards of supervisors who make the levy. "As nearly free as possible" has been treated by the law-making branch of the government as though it meant "absolutely free."

One of the legislative enactments relative to high schools (special vacation as well as regular) is section 1025, Revised Code 1928. It deals with the length of the school term and reads as follows:

"*Duration of School; Grouping of Pupils; Vacation Schools.* Boards of trustees shall maintain the schools established by them for a period of not less

than eight months during each school year, and if the funds of the district are sufficient, they shall maintain them for a longer period, and, as far as practicable, with equal rights and privileges. They may segregate groups of pupils and may maintain special schools during the vacation as necessary for the pupils of the district."

This section, it will be observed, makes it the duty of boards of education to maintain schools for at least eight months of each year, and longer if the funds (derived from state, county and district) are sufficient. It authorizes in addition special vacation schools for the pupils of the district and implies in the language used and the context that this shall be done with funds coming from the same source as those with which the regular term is maintained. (This, of course, has no reference to private summer schools sometimes held in high school buildings and taught by teachers of the district. They are not maintained by the district but are supported wholly by those who attend.)

The only charge a high school may demand of any student is a reasonable monthly tuition fee of those pupils living in the county but not in the high school district, and this must be fixed by the board of education but cannot exceed in amount the average cost per pupil of the high schools of the county after deducting the sum received from the state and county, and must be paid by the district in which the pupil resides. Par. 1075, Rev. Code 1928.

Instruction in such departments even as agricultural, mining, manual training, domestic science or other vocational pursuits, shall be free to all residents of the high school district, though nonresident students who take these special courses may be charged a monthly tuition fee of $3, but it also is a legal claim against the district in which the student resides and not against him. Par. 1084, Rev. Code 1928. If

no charge may be required of resident students pursuing special work of this character, certainly it was not contemplated that anything whatever could be collected from those taking the regular courses.

Undoubtedly the board of education acted within its powers in authorizing the organization of a summer school and also in providing that it should be held under rules to be prescribed by the superintendent of the high school, but the superintendent, no more than the board of education itself, could prescribe and enforce rules inconsistent with the law. Par. 1011, subsection 2, Revised Code 1928. It is evident that the immediate purpose of the rule was to provide a penalty, or something in the nature of a bond or guarantee, that would tend to have the effect of preventing the pupil from absenting himself from school more than three times during the summer term, but it is equally plain that its ultimate purpose was to increase the revenues of the district by keeping the average attendance on which the appropriation for the district depends as high as possible. The legislative method, however, for securing attendance is through a compulsory attendance law and its enforcement through truant officers, pars. 1033, 1034, 1035 and 1036, Revised Code 1928, and not by requiring pupils to put up a fee as a condition of their admission and then holding over them the fear that it would be forfeited if they failed to attend. Even for the laudable purpose of preventing absences and making a high average attendance, it seems plain that the board of education had under the law no right or power to require pupils to put up a fee of $5 or any other sum to guarantee their attendance before permitting them to enter the regular term, yet there is just as much reason and authority for enforcing such a rule against them as there is for applying it to summer school pupils. A laboratory fee may, it is true, be required of pupils taking certain scien-

tific courses, but this is permitted because pupils pursuing these subjects handle experimental equipment easily removed or broken and the fee is merely held as security for that which they might take away or destroy. The right to attend high school free of any tuition or other charge does not carry with it the further right to break or destroy property belonging to the district without paying for it any more than it does the right to be furnished free the text-books he must have if he is to gain the benefit from the school it was established to give him.

The authority to lay down rules for the vacation school was not all-inclusive but limited to such as were reasonable and consistent with the law, and any that did not conform to this standard was ineffective. The one in question, though prompted by a commendable purpose, seemingly took no cognizance of the right the law gives every high school pupil in the district to attend school free of any charge in the nature of a tuition or penalty to secure his attendance. Hence, it necessarily follows that the funds never became "public money" within the purview of paragraph 4734, *supra*. This, in fact, seems to have been the view Mr. Patterson himself took at the time, because he deposited them in the bank in a manner that gave him the right to check against them instead of turning them over to the county treasurer as would have been his duty had they been public funds. Par. 1092, Rev. Code 1928. The fact that they were not such renders inapplicable the case of *Pinal County* v. *Hammons,* 30 Ariz. 36, 243 Pac. 919, in which this court held that the county's claim for a preference for tax money collected by the assessor on personal property and deposited with the bank instead of the county treasurer should have been allowed by the Receiver, because the funds for which the claim was made were admittedly public money and the bank took them knowing that under the law the assessor

could deposit them only specially for safekeeping. Notwithstanding this, however, they were treated as a general deposit but this was ineffective as such since the law made a deposit of this kind unlawful. In either instance it was still public money and the county was entitled to a preference.

The judgment is reversed and the cause remanded, with directions to the trial court to allow the claim as a general one.

ROSS, C. J., concurs.

LOCKWOOD, J. — I dissent. I believe that the board of education of the Tucson High School District had the authority to require as a condition precedent to entry into the summer school the payment of the amount actually paid by each pupil and of which the deposit in question was composed. Such being the case, it was within the definition of our statute ''money . . . received . . . by . . . district . . . officers, in their official capacity.'' Rev. Code 1928, par. 4734. The principles laid down by the majority in their opinion are contrary to those followed by boards of education of high schools and junior colleges for many years. While it is, of course, true that the mere observance of a rule by administrative authorities does not validate such rule if it be clearly contrary to law, yet in doubtful cases it may well be taken as showing the intent of the legislature and the interpretation placed by it upon the statutes. In my opinion the judgment of the superior court should be affirmed.