517 P.2d 1288

**Dora N. CARPIO, for herself and for her minor children, Henrietta A. Vargas and John Ronald Dunne, and for all others similarly situated, Appellants,**

v.

**TUCSON HIGH SCHOOL DISTRICT NO. I OF PIMA COUNTY et al., Appellees.**

**No. 2 CA–CIV 1348.**

Court of Appeals of Arizona, Division 2.

Jan. 21, 1974.

Rehearing Denied Feb. 27, 1974.

Review Granted April 2, 1974.

242

John A. Tull, Legal Aid Society, Tucson, for appellants.

Gary K. Nelson, Atty. Gen., Phoenix, by John S. O'Dowd, Asst. Atty. Gen., and Lawrence Ollason, Special Deputy County Atty., Tucson, for School Affairs, for appellees.

OPINION

KRUCKER, Judge.

This appeal arises from the granting of a summary judgment in favor of the appellees. Appellants submit these three questions for review:

1. Did the lower court err in ruling that the Constitution of the State of Arizona does not require free textbooks for high school students?

2. Did the lower court err in ruling that appellees' textbook policy does not violate appellants' equal protection guarantees?

3. Did the lower court err in ruling that the challenged textbook policy does not violate appellants' due process guarantees?

The pertinent facts for resolution of these issues are as follows. Appellants, plaintiffs below, represent a class of indigent parents who are unable to pay for high school textbooks. They instituted this suit for a declaratory judgment decreeing (1) that the Arizona Constitution required Tuscon High School District No. 1 to furnish free textbooks in the high schools, (2) that the denial of free textbooks to appellants is a denial of due process and equal protection of the laws, and (3) that appellees be required to furnish free textbooks to appellants.

The State Board of Education defines a textbook as "total instructional materials prepared for use in teaching pupils in a specific subject area. This may include materials, equipment, and illustrative materials as well as the more traditional textbook." Tax funds available to the appellee school district are not used to provide textbooks and related materials for any student regardless of race, color, or financial status. There is, however, an informal procedure whereby needy students who are unable to pay for their books are advised how to apply for financial aid in the form of scholarships and loans.

Available scholarships are not administered directly by the school district nor does the money for them come from district funds. Qualifications for scholarships are financial need, satisfactory citizenship, satisfactory attendance at school and acceptable academic standing.

Students unable to pay for their books who do not seek scholarship assistance can apply for a student loan. Receipt of a loan is dependent upon financial need and a desire to repay it. If a student or his parents fail to repay the loan, the student is not denied access to school or denied a diploma. However, failure to repay can result in transcripts being withheld from colleges, other high schools and employers.

If a student demonstrates his inability to pay, a high school administrator can release his transcript.

In disposing of the issues raised on appeal, appellants' arguments will be discussed in the following order: high schools are common schools, free high school textbooks, and equal protection.

## HIGH SCHOOLS ARE COMMON SCHOOLS

Appellants argue that Article XI §§ 1, 6 and 9 of the Arizona Constitution, A.R.S., manifest an intent by the framers that high schools are common schools. The pertinent provisions of Art. XI of the Constitution are:

"Section 1. The Legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system, which system shall include kindergarden schools, common schools, high schools, normal schools, industrial schools, and a university (which shall include an agricultural college, a school of mines, and such other technical schools as may be essential, until such time as it may be deemed advisable to establish separate State institutions of such character.) The Legislature shall also enact such laws as shall provide for the education and care of the deaf, dumb, and blind.

\*     \*     \*     \*     \*     \*

Section 6. The University and all other State educational institutions shall be open to students of both sexes, and the instruction furnished shall be as nearly free as possible.

The Legislature shall provide for a system of common schools by which a free school shall be established and maintained in every school district for at least six months in each year, which school shall be open to all pupils between the ages of six and twenty-one years."

Section 9, in part, reads:

"The laws of the State shall enable cities and towns to maintain free high schools,

industrial schools, and commercial schools."

■ The governing principle of constitutional construction is to give effect to the intent and purpose of the framers of the constitutional provisions and the people who adopt it, and, unless context suggests otherwise, words are to be given their natural, obvious and ordinary meaning. County of Apache v. Southwest Lumber Mills, Inc., 92 Ariz. 323, 376 P.2d 854 (1962). Both the Constitution and case law of Arizona are silent as to the meaning of common schools. Therefore, we deem it essential to review some legislative enactments in order to ascertain the intent of the framers.

Soon after the adoption of our Constitution, the Arizona Legislature enacted a law which provided for appropriation of school money to the counties. Revised Statutes § 2816 (1913). In 1928, the amount of money appropriated to the counties was based upon the average daily attendance in common schools and high schools. Revised Code § 1089 (1928). This appropriation method was continued in 1933, Revised Code § 1089 (1928), as amended § 1089 Revised Code (Supp.1934), and definitions of common schools and high schools were added for the first time. Common schools were defined "to include the first to eighth grades, inclusive," and high schools were defined "to include the grades nine to twelve, inclusive." Since 1933 our Legislature has retained the same definition of common schools and high schools.[1]

■ It is well settled that where the legislature has by statute adopted a reasonable construction of a constitutional provision, its action has strong persuasive force and will ordinarily be followed. Woodcock v. Dick, 36 Cal.2d 146, 222 P.2d 667 (1950). This is particularly true with constitutional provisions since broad subjects must be covered therein with few words, making it impossible to state explicitly every detail or shade of meaning intended. Fairfield v. Foster, 25 Ariz. 146, 214 P. 319 (1923).

■ Art. XI § 1 of the Constitutional enumerates the types of schools within our uniform public school system. For forty years our Legislature has defined common schools and high schools to mean two separate schools based on grade levels. Such a construction is reasonable, consistent with Art. XI § 1 and § 6 of the Constitution and is persuasive. It is the opinion of this court that in Arizona common schools are the first to eighth grades, inclusive, and high schools are grades nine to twelve, inclusive. Therefore, we find no merit in appellants' contention that a "system of common schools" as used in Art. XI, § 6 comprises all grades from one through twelve.

## FREE HIGH SCHOOL TEXTBOOKS

Notwithstanding the fact that high schools are not common schools, appellants contend that the Arizona Supreme Court has ruled that our Constitution requires instruction in high schools to be absolutely free, which necessarily includes free textbooks. In support of their position, they cite Estate of Arizona Southwest Bank, 41 Ariz. 507, 19 P.2d 1063 (1933), and several cases from other jurisdictions.

In the *Arizona Southwest Bank* case, the issue to be resolved was whether certain deposits in an insolvent bank should be subject to a preferred claim. The court had to first determine whether the deposits were public money because if they were, the claim would be preferred. The money in question came from a $5.00 tuition charge collected by a high school principal as a guarantee that pupils would attend summer school. The court held that the claim was not preferred because the deposits were not public money. In reaching this result, it found that the principal had neither the express nor implied power to

---

1. *See*, § 54–602, Ariz.Code Annot. (1939), as amended § 54–602, Ariz.Code Annot. (Cum. Supp.1952) ; § 15–1212, Ariz.Rev.Stat.Annot. (1956), as amended § 15–1212, Ariz.Rev.Stat. Annot. (Supp.1973).

demand money as a guarantee of attendance. The court discussed the nature of charges a high school may demand of a student, stating:

"A reading of all those [statutes and constitutional provisions] dealing with the public school system, however, leads to the conclusion that instruction in high as well as in common schools shall be absolutely free." 41 Ariz. at 511, 19 P. 2d at 1065.

\*　\*　\*　\*　\*　\*

"The only charge a high school may demand of any student is a reasonable monthly tuition fee of those pupils living in the county but not in the high school district. . . ." 41 Ariz. at 513, 19 P. 2d at 1065.

Appellants maintain that the above-quoted language mandates free textbooks. We disagree. In stating that "instruction in high . . . schools shall be absolutely free," the court did not intend to include free textbooks. In fact, the court noted that:

"The right to attend high school free of any tuition or other charge does not carry with it the further right to break or destroy property belonging to the district without paying for it any more than it does the right to be furnished free the text books he must have if he is to gain the benefit from the school it was established to give him." 41 Ariz. at 515, 19 P.2d at 1066.

We conceive that the court was referring only to charges in the nature of tuition. This is evidenced by the above statement and also the following:

"The one [charge] in question, though prompted by a commendable purpose, seemingly took no cognizance of the right the law gives every high school pupil in the district to attend school free of

any charge in the nature of a tuition or penalty to secure his attendance. Hence, it necessarily follows that the funds never became 'public money' . . . ." 41 Ariz. at 515, 19 P.2d at 1066.

Art. XI § 6 of our Constitution provides for a free common school system. Pursuant to this provision, the Arizona legislature in 1912 enacted a law providing free textbooks to the common schools. Revised Statutes § 2825 (1913). Free textbooks for common schools have been provided by statute from 1912 to the present.[2] The Constitution and our statutes have always been silent with respect to high school textbooks.

As stated in Washington County v. State Tax Commission, 103 Utah 73, 133 P.2d 564 (1943):

" 'It is a general rule that contemporaneous construction by the department of government specially delegated to carry out a provision of the Constitution raises a strong presumption that such construction, if uniform and long acquiesced in, rightly interprets the provision. \* \* \* While such construction is not conclusive upon the courts, it is entitled to the most respectful consideration.' " 133 P.2d at 568.

Our legislature is delegated the authority to carry out the provisions of Article XI §§ 1 and 6. For more than sixty years it has provided for free textbooks only in the common schools. Such long acquiescence by our legislature is persuasive to this court.

Appellants also refer us to cases from other jurisdictions which have held that charging for textbooks and related materials was illegal.[3] These cases required interpretation of the respective state constitutions. Implicit in the holding of each case was a finding that the constitu-

2. See, § 1048, Rev.Code, (1928), as amended § 1048, Rev.Code (Supp.1934) ; § 54–1102, Ariz.Code Annot. (1939), as amended § 54–1102, Ariz.Code Annot. (Cum.Supp. 1952) ; § 15–1101 Ariz.Rev.Stat.Annot. (1956), as amended § 15–1101 Ariz.Rev.Stat.Annot. (Supp.1973).

3. See, Granger v. Cascade County School District No. 1, 159 Mont. 516, 499 P.2d 780 (1972) ; Bond v. Public Schools of Ann Arbor School District, 383 Mich. 693, 178 N.W. 2d 484 (1970) ; and Paulson v. Minidoka County School District No. 331, 93 Idaho 469, 463 P.2d 935 (1970).

tion required high schools to be free. Our Constitution is dissimilar. As did the Illinois Supreme Court in Hamer v. Board of Education of School District No. 109, 47 Ill.2d 480, 265 N.E.2d 616 (1971), we find the cases cited by appellants inapposite.

Appellants also argue that Article XI § 9 of our Constitution, which provides that the "laws of the State shall enable cities and towns to maintain free high schools. . . ." is an unequivocal expression of our constitutional intent that high schools are to be free. We do not agree. The natural, obvious and ordinary meaning of § 9 is that cities and towns can, if they so desire, maintain free high schools. There is no requirement that the state or counties do so.

We therefore hold that the Arizona Constitution does not mandate free textbooks for high school students.[4]

### EQUAL PROTECTION

Appellants' next argument is that appellees' textbook policy is in violation of the equal protection clause of the 14th Amendment. They contend that the policy invidiously discriminates against indigents and such discrimination fails to meet the traditional standard of equal protection. They also claim that the denial of free textbooks is an economic classification which in its application denies indigents equal participation in the educational system, hence is suspect and subject to close judicial scrutiny.

■ In the instant case, we find no merit in appellants' argument that wealth is a suspect classification which must be justified by a compelling state interest. Prior to the decision in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), it was unclear whether wealth discrimination was suspect. Our analysis of the San Antonio case leads us to conclude that the Supreme Court rejected the contention that wealth discrimination alone provides an adequate basis for invoking strict scrutiny in equal protection cases. The Court also rejected the contention that education is a fundamental right under the United States Constitution and refused to apply the strict scrutiny test in a challenge to Texas' schools financing system.

Recently, in the case of Shofstall v. Hollins, 110 Ariz. 88, 515 P.2d 590 (1973), the Arizona Supreme Court held that the Arizona Constitution establishes education as a fundamental right of pupils between the ages of six and twenty-one years, but adhered to the traditional reasonable basis test in rejecting a challenge to the State's school financing system. The guidance provided by San Antonio and Shofstall dictates that strict scrutiny is not applicable in this case.

■ The usual standard for reviewing a state's social and economic legislation is the traditional "reasonable basis" test, Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), and the importance of education alone does not require a departure from this usual standard. San Antonio, 93 S.Ct. at 1297. We therefore apply that standard in the case sub judice.

In granting appellee's motion for summary judgment, the lower court ruled as follows:[5]

"That even if plaintiffs prove that defendants' actions denying free textbooks to plaintiffs and plaintiffs' class causes an educational disadvantage to plaintiffs and the class, or denies to plaintiffs and the class educational opportunity equal to children of those families that can afford to pay for fees for textbooks, as a matter of law such facts do not constitute a denial or abridgment of plaintiffs' rights of due process or equal protection

---

4. We know of no Constitutional impediment prohibiting the Legislature from providing free textbooks for high school students if it is so desired.

5. Partial judgment on appellants' due process and equal protection claims was entered in favor of appellees on January 30, 1973.

under the Fourteenth Amendment to the United States Constitution. . . ."

This ruling was based solely on the case of Johnson v. New York State Education Department, 449 F.2d 871 (2d Cir. 1971), cert. granted 405 U.S. 916, 92 S.Ct. 986, 30 L.Ed.2d 785 (1972), vacated and remanded, 409 U.S. 75, 93 S.Ct. 259, 34 L.Ed.2d 290 (1972). In *Johnson,* the state of New York provided financial aid to local school districts for the purchase of textbooks for children in grades seven through twelve, but no such provision was made for grades one through six. The Second Circuit held that this was a reasonable legislative classification not violative of the equal protection clause.

We do not consider the *Johnson* case persuasive authority. The propriety of the decision is very questionable in view of the fact that certiorari was granted and the case remanded solely for a determination of mootness.[6] Of considerable pertinence is the following statement of Mr. Justice Marshall in this concurring opinion:

"This case obviously raises questions of large constitutional and practical importance." 93 S.Ct. at 260.

■ Under traditional equal protection principles, a state retains broad discretion to classify as long as its classification has a reasonable basis. Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971); Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). The equal protection clause of the 14th Amendment does not make every minor difference in the application of laws to different groups a violation of that amendment, but "invidious" distinctions are denounced. Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968). To determine whether or not a state law violates the equal protection clause, we must consider the facts and circumstances behind the law, the interests which the state claims to be protecting, and the interests of those who are disadvantaged by the classification. Williams v. Rhodes, supra.

In the instant case, appellees' textbook policy creates two classes of high school students: (1) those who are unable to purchase textbooks because of indigency and (2) those with sufficient resources to purchase their own textbooks. The question therefore is—does not this classification constitute a denial of equal protection?

To justify their textbook policy, appellees set forth the following:[7]

"(1) to raise the level of education of all citizens to a minimum level by providing free textbooks at the common school level; (2) to provide instructions for students in grades nine through twelve; and (3) to accomplish these goals within a finite budget."

This interest vis a vis appellants' interest, which has been aptly described by the United States Supreme Court in Brown v. Board of Education of Topeka, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and quoted with approval in *San Antonio,* supra:

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any

---

6. After certiorari was granted, the qualified voters of the respondent school district elected by a majority vote to assess a tax for the purchase of *all* textbooks for grades one through six in the schools of the district. In light of this fact and that the books had a life expectancy of five years, the case was remanded to the District Court for a determination of mootness. 409 U.S. 75, 93 S.Ct. 259, 34 L.Ed.2d 290 (1972).

7. Quoted from appellees' answering brief.

child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." 74 S. Ct. at 691.

The importance of education is also recognized in Arizona. In *Shofstall* the Arizona Supreme Court held that our Constitution ". . . establish[es] education as a fundamental right of pupils between the ages of six and twenty-one years." Since Arizona has undertaken to provide our pupils with this "fundamental right," it should make it available to all on equal terms.

█. The fact that appellees do not provide free textbooks for any high school student regardless of race, color or financial status, on its face appears to be non-discriminatory. However, a law [or policy] nondiscriminatory on its face may be grossly discriminatory in its operation. Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956). The operative effect of the textbook policy is determinative of the equal protection question.

█ Appellants were precluded from proving that the textbook policy is discriminatory in operation because the lower court ruled as a matter of law that denial of free textbooks would not constitute a denial of equal protection. This ruling was erroneous. We believe that whether the textbook policy constitutes a denial of equal protection depends upon appellants' evidentiary presentation.

In Griffin v. Illinois, supra, the United States Supreme Court invalidated state laws that prevented an indigent criminal defendant from acquiring a transcript or an adequate substitute for a transcript, for use at several stages of the trial and appeal process. It held that destitute defendants must be afforded as adequate appellate review as defendants who have sufficient funds to buy transcripts. The Court pointed out that a state need not subsidize a transcript in every instance where a defendant cannot buy it, indicating there may be alternative means of affording adequate and effective review to indigent defendants. The decision rested on equal protection as well as due process principles.

The appellees' textbook policy may deny indigent high school students the opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and full participation in the political process—a basic education. The situation is adequately described in Paulson v. Minidoka County School District No. 331, supra:

"Textbooks are necessary elements of any school's activity. They represent a fixed expense peculiar to education, the benefits from which inure to every student in equal proportion (ignoring differences in ability and motivation) solely as a function of his being a student. Unlike pencils and paper, the student has no choice in the quality or quantity of textbooks he will use if he is to earn his education. He will use exactly the books, prescribed by the school authorities, that his classmates use; and no voluntary act of his can obviate the need for books nor lessen their expense. School books are, thus, indistinguishable from other fixed educational expense items such as school building maintenance or teachers' salaries." 463 P.2d at 938–939.

Guided by *Griffin* and the importance of appellants' interest in receiving a basic education, we hold that indigent high school students who cannot afford textbooks must be provided as adequate an educational opportunity as students who can afford to buy their own textbooks. Since this appeal arises from summary judgment in favor of appellees, appellants were foreclosed from establishing how the textbook policy denied them this opportunity. We therefore remand this case for further proceedings on this issue.

█ Since the equal protection clause allows some inequality, whether or not appellants have been denied equal protection will depend on the evidence they present. If they show (1) that appellees do not fur-

nish indigent students a sufficient number of free textbooks, available for use at home and/or at school, and (2) as a result thereof indigent students are denied admission to school or class, denied a diploma or transcript, or otherwise penalized, either directly or indirectly, for failure to purchase a textbook, then the equal protection clause of the Fourteenth Amendment is violated. Absent such showing, appellants' equal protection claim fails.

Our holding does not require appellees to purchase free textbooks for each individual indigent student. The books may remain the property of the school district but a sufficient number of them must be made available so that indigent students can have access to them on a check-out basis or other type of procedure. Making textbooks available to indigent students without cost affords them as equal an educational opportunity as those students who can afford to purchase their own textbooks.

The partial summary judgment in favor of appellees of September 25, 1972, is affirmed. Partial summary judgment of January 30, 1973, is vacated and the cause is remanded to the superior court for further proceedings not inconsistent with this opinion.

HATHAWAY, C. J., and HOWARD, J., concur.