524 P.2d 948

Dora N. CARPIO, for herself and for her minor children, Henrietta A. Vargas and John Ronald Dunne, and for all others similarly situated, Appellants,

v.

TUCSON HIGH SCHOOL DISTRICT NO. I OF PIMA COUNTY, State Board of Education, Weldon P. Shofstall, Superintendent of Public Instruction, and Anita Lohr, Pima County Superintendent of Schools, Appellees.

No. 11507-PR.

Supreme Court of Arizona,
In Banc.

July 24, 1974.

Rehearing Denied Sept. 17, 1974.

N. Warner Lee, Atty. Gen., Gary K. Nelson, Former Atty. Gen., Phoenix, by John S. O'Dowd, Asst. Atty. Gen., and Lawrence Ollason, Sp. Deputy County Atty., for School Affairs, Tucson, for appellees.

John A. Tull, Tucson, for appellants.

STRUCKMEYER, Justice.

Appellant Dora N. Carpio brought this suit as a class action and on behalf of her minor children, Henrietta A. Vargas and John Ronald Dunne. From two orders of the Superior Court of Pima County granting the Tucson High School District's motion for summary judgment, she appealed. The Court of Appeals, Division Two, reversed, 21 Ariz.App. 241, 517 P.2d 1288 (1974). Opinion of the Court of Appeals vacated and judgment of the Superior Court of Pima County affirmed.

The facts are simple and not in dispute. *Appellants* are indigents who at the time of the commencement of this suit attended Tucson High School District # 1. In Arizona, free textbooks for those attending a high school are not provided by the State. Appellant first urges that the State Constitution requires high school pupils be furnished their textbooks free.

Since statehood, Arizona's Constitution has provided for a uniform public school system in this language:

"The Legislature shall enact such laws as shall provide for the establishment and maintenance of a general and uniform public school system, which system shall include kindergarten schools, common schools, high schools, normal schools, industrial schools, and a university * * *." Art. XI, § 1.

The enumeration of the public schools of the State under this article of the Constitution is a series from the lowest school to the highest. Common schools are ranked between kindergartens and high schools. The conclusion is therefore strongly suggested that by the use of the words "common schools" the framers of the Constitution meant those grades between kindergarten and high school.

This conclusion is reinforced by the language of Ch. 77, § 83, Laws of 1912. There, it was provided by the First State Legislature that "All pupils shall be promoted from the eighth grade of the common schools on certificate of promotion, signed by the teacher or principal or City Superintendent of the eighth grade, and the County Superintendent of Schools." The same Act also provided that "Such certificates shall admit the holders thereof to admittance to any high school in the State." Later, by Ch. 65, § 8, Laws of 1933, common schools were specifically recognized as those from the first to the eighth grades and high schools as those grades from nine through twelve.

The Constitution of Arizona has also provided since statehood, by Art. XI, § 6, that:

"The University and all other State educational institutions shall be open to students of both sexes, and the instruction furnished shall be as nearly free as possible.

The Legislature shall provide for a system of common schools by which a free school shall be established and maintained in every school district for at least six months in each year, which school shall be open to all pupils between the ages of six and twenty-one years."

The distinction made in § 6 is that while the instruction furnished in the university and all other State educational institutions is to be *as nearly free as possible,* the system of common schools to be established must have a free school in every school district. Textbooks for those attending common schools were provided by the First Legislature, Ch. 72, § 1, Laws of 1912, and *see* § 2825 of the Revised Statutes of 1913. But textbooks for those attending high schools and the State University have not been provided then or since.

In 1933, in construing the words "the instruction furnished shall be as nearly free as possible," this court said that those words had been treated by the law-making branch of the government as though they meant absolutely free. In the Matter of the Estate of Arizona Southwest Bank v. Board of Education of Tucson High School District, 41 Ariz. 507, 512, 515, 19 P. 1063 (1933). However, it should be recognized that the court was speaking of instruction in the state high schools. Instruction in high schools has been free since statehood; although, as stated, textbooks have not been provided free in high schools as they have been in the common schools.

 We are therefore of the opinion that the proper construction of the Arizona Constitution compels the conclusion that the word "free" was intended to include free instruction and textbooks, and that the words "as nearly free as possible" do not require that either be provided without

charge although they could be if the Legislature in its discretion saw fit to do so.

This brings us to appellant's second contention, that the failure to supply indigent children attending high schools in Arizona with textbooks is a denial of the equal protection of the law. In this, we think the principles which controlled the decision in San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973), have application here.

In that case, a suit was brought by Mexican-American parents, whose children attended the elementary and secondary schools in an urban school district in San Antonio, Texas, attacking the Texas system of financing public education. A three-judge court rendered judgment that the Texas school financing system was unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In reversing the district court, the Supreme Court noted that it must decide whether the Texas system of financing public education operated to the disadvantage of some suspect class or impinged upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring the application of the principle of strict judicial scrutiny.

The strict judicial scrutiny test has been recently adopted by the Supreme Court of the United States to fashion a more uncompromising equal protection standard than that of the rational basis test. Under the strict judicial test, there must be shown a compelling overriding state interest in support of the classification and the state is required to demonstrate that the distinctions drawn by law are necessary to achieve the purpose for which the law was enacted. Kramer v. Union Free School District, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). And *see* the discussion on the constitutional test of equal protection, 14 Ariz.L.Rev., pages 105 through 112.

In San Antonio School District v. Rodriguez, the Supreme Court rejected the strict judicial scrutiny test because it found neither a suspect classification nor a right arising explicitly or implicitly out of the Federal Constitution. In considering the wealth discrimination argument, the Court said:

"Apart from the unsettled and disputed question whether the quality of education may be determined by the amount of money expended for it, a sufficient answer to appellees' argument is that at least where wealth is involved the Equal Protection Clause does not require absolute equality or precisely equal advantages. Nor indeed, in view of the infinite variables affecting the educational process, can any system assure equal quality of education except in the most relative sense." 411 U.S. 1, 23–24, 93 S.Ct. 1278, 1291, 36 L.Ed.2d 16, 37.

The Court also noted that it has never held that wealth discrimination alone provided an adequate basis for invoking strict scrutiny.

The Supreme Court then addressed itself to the question of whether education is a fundamental right in the sense that it is among the rights and liberties protected by the Constitution. It decided:

"Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected." 411 U.S. 1, 35, 93 S.Ct. 1278, 1297, 36 L.Ed.2d 16, 44.

And:

"It should be clear, for the reasons stated above and in accord with the prior decisions of this Court, that this is not a case in which the challenged state action must be subjected to the searching judicial scrutiny reserved for laws that create suspect classifications or impinge upon constitutionally protected rights." 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16, 47.

We therefore conclude that the instant case is to be determined by the general presumption of constitutionality affecting state laws and the traditional conclusion given state classifications where a court can conceive of a rational basis for the

**130**

distinctions made. Kramer v. Union Free School District, *supra*.

In considering the State action in not providing free textbooks to high school children, we cannot say that it has no rational basis. It is apparent from an examination of the Arizona Constitution that the framers concluded that effective speech and informed electoral choice could be attained by providing a free common school education. It is within the Legislature's discretion to say what the limits of a free education should be beyond the minimum set forth in Arizona's Constitution.

As said in Johnson v. New York State Education Department, 449 F.2d 871, 880 (2d Cir. 1971), remanded for determination of mootness, 409 U.S. 75, 93 S.Ct. 259, 34 L.Ed.2d 290 (1972):

"Unless the courts are to take over legislative functions and to decree that all children in all grades are to have free textbooks, the judgment of the Legislature should control."

One further point should be considered. In Shofstall v. Hollins, 110 Ariz. 80, 515 P.2d 590 (1973), we held that the Constitution by its provisions assured to every child a basic education. It is clear from our discussion that the basic education of which we spoke only extended to a uniform, free common school system open six months a year to all persons between the ages of six and twenty-one years. These fundamental rights found in Art. XI, §§ 1 and 6 of the Arizona Constitution were determined to be satisfied by the existing school financing system.

Finally, appellants argue that the failure to provide free textbooks violates the guarantees of due process of law. They rely on Boddie v. Connecticut, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971), asserting that the Supreme Court of the United States has expressly ruled that "burdening the access of an indigent to an essential service by requiring the payment of a fee constitutes a deprivation of due process protections." We do not so read *Boddie*. The most that can be said is that the fundamental right of access to the courts cannot be conditioned upon a person's ability to pay because procedural due process includes not only the right to a hearing but the right to access to resolve the dispute. It is not our understanding that an indigent has been given the right to avoid paying non-litigation state fees; cf. Constitutional Law Reform for the Poor: Boddie v. Connecticut, Arthur B. LaFrance, Duke Law Journal, 1971, at 537.

The orders of the Superior Court of Pima County granting the Tucson High School District #1 motion for summary judgment are affirmed.

HAYS, C. J., CAMERON, V. C. J., and LOCKWOOD and HOLOHAN, JJ., concur.