Frank NAGY, on behalf of himself, his children, Weston Nagy and Jordan Nagy, and those similarly situated, and Sonja Brackett, on behalf of herself, her children, Cory Brashear and Cameron Brackett, and those similarly situated, Appellants/Cross–Appellees–Plaintiffs,

v.

EVANSVILLE–VANDERBURGH SCHOOL CORPORATION, Appellee/Cross–Appellant–Defendant.

No. 82A01–0308–CV–299.

Court of Appeals of Indiana.

May 28, 2004.

---

Jacquelyn Bowie Suess, Kenneth J. Falk, Indiana Civil Liberties Union, Indianapolis, IN, Attorneys for Appellants.

Patrick A. Shoulders, Robert L. Burkart, Ziemer Stayman Weitzel & Shoulders, LLP, Evansville, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

The Appellants/Cross–Appellees in this case, Frank Nagy, on behalf of himself and his children Weston and Jordan Nagy, and Sonja Brackett, on behalf of herself and her children Cory Brashear and Cameron Brackett, and those similarly situated ("the Parents"), challenge the trial court's grant

of summary judgment in favor of the Appellee/Cross–Appellant, the Evansville–Vanderburgh School Corporation ("EVSC") on the Parents' claim that the EVSC's policy of charging students a certain fee violates Article 8, Section 1 of the Indiana Constitution. In its cross-appeal, the EVSC challenges the trial court's grant of summary judgment in favor of the Parents on their claim that the EVSC's policy violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

We reverse and remand.

The relevant facts are substantially undisputed. Beginning with the 2002–2003 school year, the EVSC imposed a twenty-dollar student activity fee upon students in kindergarten through twelfth grade. The EVSC School Board imposed this fee at the recommendation of the teacher's union and the EVSC, which worked together to find a solution to the EVSC's budget deficit without raising taxes. In 2002, the EVSC had incurred a budget deficit of $2,300,000, and for 2003, the projected budget deficit was $5,500,000. Approximately $1,500,000 of the 2002 deficit was the result of the State's failure to provide funds which had been anticipated, and the remainder of the deficit was the result of increased costs in the EVSC's standard operations. The EVSC is required by State law to have a balanced budget. The fee, along with State funds and local property tax revenues are deposited into the EVSC's general fund, which is used to fund school expenses. The EVSC does not maintain a specific object number or function number to track what the money collected as a result of the fee is used to pay for.

Nevertheless, the EVSC claims that the fee is used to pay for the following expenses: (1) the coordinator of student services; (2) elementary school counselors; (3) media specialists, formerly known as librarians; (4) school nurses; (5) alternative education; (6) the police liaison program; and (7) extra-curricular activities, which includes athletic programs, the drama program, the music program, academic programs, and speech and debate programs.

The fee was assessed against all students, regardless of whether they were eligible to participate in the reduced or free lunch and textbook programs. If the parents of a student fail to pay the fee, the parents are notified that their bill will be referred to a law firm for collection and that attorneys fees of up to $100 will be charged regardless of whether a collection suit is actually brought against them. After the filing of the current action, and by agreement of the parties, the EVSC has decided not to initiate any collection proceedings until a final judgment has been rendered in the present case.

Frank Nagy is the parent of two children enrolled in EVSC schools. On October 4, 2002, Mr. Nagy filed a class action complaint for declaratory and injunctive relief. On October 18, 2002, the complaint was amended by the addition of Sonja Brackett as the named representative of a putative subclass. Ms. Brackett's children were eligible in the 2002–2003 school year for the free or reduced school lunch and textbook programs. The amended complaint asserted two claims for relief: (1) that the imposition of the fee violates Article 8, Section 1 of the Indiana Constitution, and (2) that the fee violates the substantive due process rights guaranteed by the Fourteenth Amendment to the United States Constitution.

The EVSC filed a motion to dismiss the Parents' due process claim on November 27, 2002. On December 10, 2002, the parties filed an agreed entry as to certification of the class, which the trial court approved.

On January 16, 2003, before the trial court acted on the motion to dismiss, the Parents moved for summary judgment. The EVSC filed a cross-motion for summary judgment on March 3, 2003. On April 21, the trial court granted the EVSC's motion to dismiss the Parents' due process claim. The Parents filed a motion to reconsider this dismissal on May 2, 2003.

Thereafter, on June 23, 2003, the trial court granted summary judgment to the EVSC upon the claim brought under Article 8, Section 1, but granted summary judgment to the subclass, concluding that imposing the fee upon those who qualified for the reduced or free school lunch and textbook programs violated substantive due process.[1] Because the trial court had earlier granted the motion to dismiss the due process claim, the Parents filed a motion to correct error, to which the EVSC objected. In granting the Parents' motion to correct error, the trial court certified the sub-class relative to the due process claim. On August 11, 2003, the Parents filed a notice of appeal, and on August 18, 2003, the EVSC also filed a notice of appeal.

### Summary judgment

When reviewing a grant or denial of a motion for summary judgment, we stand in the shoes of the trial court. *Cox v. Town of Rome City*, 764 N.E.2d 242, 245 (Ind.Ct. App.2002), *reh'g denied.* We do not weigh the evidence, but rather we consider the facts in the light most favorable to the non-moving party. *Id.* at 246. Summary judgment is appropriate only if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Id.* (citing Ind. Trial Rule 56(C)). A genuine issue of material fact exists when there is a dispute, or when undisputed facts are capable of supporting conflicting inferences, about an issue which would dispose of the litigation. *Id.* at 245–46. Once the moving party demonstrates, prima facie, that there are no genuine issues of material fact as to any determinative issue, the burden shifts to the non-moving party to come forward with contrary evidence. *Id.* at 246. We may sustain the judgment upon any theory supported by the designated evidence. *Id.* Cross-motions for summary judgment do not alter our standard of review. *Id.*

### I

### *Article 8, Section 1 of the Indiana Constitution*

In their appeal, the Parents challenge the trial court's grant of summary judgment in favor of the EVSC upon the Parents' claim that the EVSC's imposition of the fee violates Article 8, Section 1 of the Indiana Constitution, which reads:

> "Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools,[2] *wherein tuition shall be without charge,* and equally

---

**1.** This ruling effectively granted Parents' motion to reconsider the dismissal of the due process claim and vacated that dismissal.

**2.** "Common schools" is synonymous with "public schools" and includes high schools. *State v. O'Dell*, 187 Ind. 84, 87, 118 N.E. 529, 530 (1918).

open to all." (emphasis supplied).

According to the Parents, the fee amounts to a charge for tuition, which is violative of the constitutional provision in question. Our task is to determine what is meant by the phrase "wherein tuition shall be without charge."

 We analyze questions arising under the Indiana Constitution by examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions. *Indiana Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 298 (Ind.1994). The task of interpreting a particular provision of the Indiana Constitution is a search for the common understanding of both those who framed it and those who ratified it. *Bayh v. Sonnenburg*, 573 N.E.2d 398, 412 (Ind.1991). In placing a construction upon a constitution or any clause or part thereof, we should look to the history of the times and examine the state of things existing when the constitution or any part thereof was framed and adopted in order to ascertain the old law, the mischief, and the remedy. *Id.*

The only Indiana case which directly deals with the meaning of "tuition" within Article 8, Section 1 is *Chandler v. South Bend Cmty. Sch. Corp.*, 160 Ind.App. 592, 312 N.E.2d 915 (1974). In *Chandler*, the Third District of this court was faced with a challenge to the constitutionality of charging students a textbook rental fee. The plaintiffs claimed that charging for textbooks violated the free tuition provi-

sion of Article 8, Section 1. The court concluded:

"We can find no basis for interpreting the word 'tuition,' to include textbooks used in public schools of the State. Black's Law Dictionary defines tuition as 'The act or business of teaching the various branches of learning.' Webster's Third New International Dictionary adds '... the act of teaching: the services or guidance of a teacher: ... the price of or payment for instruction.' Neither definition states or implies that the word entails textbooks. Nor does the case law interpreting constitutional mandates of free tuition similar to that in Article 8, Section 1, indicate a contrary result. *See Rheam v. Bd. of Regents of University of Oklahoma* (1933), 161 Okl. 268, 18 P.2d 535, 538 and *State ex rel. Priest v. Regents of University of Wisconsin* (1882), 54 Wis. 159, 11 N.W. 472, 473." *Chandler*, 160 Ind.App. at 601, 312 N.E.2d at 920.

Although the fifth, sixth, and seventh editions of Black's Law Dictionary contain no entry for "tuition," the Webster's definition used in *Chandler* is still current. Similarly, the non-obsolete definitions of "tuition" contained in the New Shorter Oxford English Dictionary are, "The action, business, or function of a teacher; teaching, instruction (esp. in return for a fee)." [3] *Id.* at 3418. Thus, Article 8, Section 1 mandates that the State at the very least not charge students for the functions or services of a teacher, teaching, or instruction.

The *Chandler* court, although acknowledging that a historical perspective "pro-

---

**3.** The obsolete definition includes, "The action of looking after or taking care of a person or thing; the condition of being taken care of; protection, defence, custody, care.... The position of a guardian in relation to a ward; guardianship." *Id.* The New Shorter Oxford

English Dictionary also lists the originally American definition of "A fee or fees paid for tuition." *Id.* This perhaps more common usage, however, originated in the twentieth century. *See id.*

vide[s] a valid insight," refused to consider the historical context surrounding the adoption of Article 8, Section 1, stating that such consideration is appropriate only where an ambiguity is present. *See* 160 Ind.App. at 602, 312 N.E.2d at 920–21. However, given the importance of such context and the standard set forth in *Bayh, supra,* we feel it prudent to explore the history and background of this provision.

Education has long been an important part of the fundamental law of Indiana. Our current Article 8, Section 1 is the successor to similar provisions in the 1816 Indiana Constitution and an educational provision of the Northwest Ordinance of 1787. *See generally* 1 CHARLES KETTLEBOROUGH, CONSTITUTION MAKING IN INDIANA 3 (1916). Article Three of the Northwest Ordinance stated in part, "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged...." *Id.* at 31–32. Upon Indiana's admittance into the Union in 1816, our first State Constitution contained the following provision regarding education:

"Sec. 1st. Knowledge and learning generally diffused, through a community, being essential to the preservation of a free Government, and spreading the opportunities, and advantages of education through the various parts of the Country, being highly conducive to this end, it shall be the duty of the General Assembly to provide, by law, for the improvement of such lands as are, or hereafter may be granted, by the [U]nited States to this state, for the use of schools, and to apply any funds which may be raised from such lands, or from any other quarters to the accomplishment of the grand object for which they are or may be intended....

Sec. 2. It shall be the duty of the General [A]ssembly, as soon as circumstances will permit, to provide by law, for a general system of education, ascending in a regular graduation, from township schools to a state university, *wherein tuition shall be gratis,* and equally open to all." *Id.* at 113–14 (emphasis supplied).

As observed by our Supreme Court in *Richardson v. State,* our ability to discern the intentions of the framers of the 1816 Constitution is limited, because the journal of the 1816 constitutional convention does not report the delegates' remarks or disclose informative procedural matters. 717 N.E.2d 32, 38 (Ind.1999) (citing JOURNAL OF THE CONVENTION OF THE INDIANA TERRITORY, reprinted in 61 IND. MAG. OF HIST. 89–155 (1965)). Indeed, our review of the journal of the 1816 constitutional convention reveals little insight into the educational provisions of the 1816 Constitution.[4] However, one commentator has stated that despite this "liberal provision" for education in the 1816 Constitution, "[t]he qualifying words, 'as soon as circumstances will permit,' left this promise unfulfilled by the General Assembly until it was replaced in the 1851 Constitution." WILLIAM P. MCLAUCHLAN, THE INDIANA STATE CONSTITUTION, A REFERENCE GUIDE 34 (1996).

The second Indiana constitutional convention, which led to the adoption of our current state Constitution, left a more

---

4. We could glean from the 1816 journal only that a committee relative to education was formed by the convention, and that this committee later reported with the educational provisions quoted above. *See* 61 IND. MAG. OF HIST. at 98, 143. The provisions were then accepted by the convention without amendment. *See id.* at 149; KETTLEBOROUGH, *supra,* at 114 n. 56.

complete record of its activities. Unfortunately, very little of this record provides a direct insight as to what the framers meant when they provided that "tuition shall be without charge." Yet there was considerable debate in the convention regarding the educational provisions of the proposed new constitution, particularly regarding the funding of the common school system.[5] Still, the debates do reveal that education was an important topic to citizens of the day. One delegate, Mr. Read of Monroe County, speaking in support of establishing an office of Superintendent of Schools, stated:

> "We are, sir, laying broader political foundations.... The education of every child in the State has become simply a political necessity. It is a necessary measure of defense and self-preservation. We *must*—yes, sir, I repeat it, we *must* have a better devised and more efficient system of general education. On this subject, there can be but one opinion in this body, and indeed, among the people of the State at large." 2 REPORT OF THE DEBATES AND PROCEEDINGS OF THE CONVENTION FOR THE REVISION OF THE CONSTITUTION OF THE STATE OF INDIANA 1850, at 1858–59 (1850) (hereinafter "Debates") (emphasis in original).

Another delegate, Mr. Bryant of Warren County, quoted from the 1840 census, which indicated that Indiana was "the most ignorant *of all the free States*, and far, very far, *behind many of the slave States*." Debates at 1889–90 (emphasis in original). According to Mr. Bryant, the 1840 U.S. Census revealed that over 38,100 Indiana citizens over the age of twenty-one were illiterate.[6] *Id.* at 1890. As a result of these disturbing statistics, the people of this State called for improvements and to "adopt some system of general education in accordance with that marked out by the framers of [the 1816] Constitution.... [A] bill was passed through the House of Representatives, and defeated in the Senate. The question was submitted to the people, whether they would have *free schools* or not. They responded in the affirmative by a majority of about sixteen thousand...." *Id.* (emphasis supplied). Thereafter, a new bill was passed by the House which established a system of free schools with a "limited tax." *Id.* The Senate then referred this to the citizenry of the State by a provision that the law should operate in only those counties which adopted it by a popular vote, and more than sixty counties did so. *Id.* See also *Maize v. State*, 4 Ind. 342 (1853) (referring to "school law of 1849"). Such efforts were either too little or too late, for the 1850 U.S. Census showed that Indiana had 73,299 illiterate men and women.[7] *Debates* at 1890.

In light of this historical context, we can say with some certainty that the evil to be addressed by what became Article 8 of our Constitution was a lack of education and

---

5. School funding, it would seem, has been a contentious topic for quite some time.

6. According to the 1840 U.S. Census, the population of Indiana was 685,866. *Historical Census Browser*, http://fisher.lib.virginia.edu/collections/stats/histcensus/ (last visited May 21, 2004). The same census indicates that the white population under the age of twenty numbered 410,649, while the black population under the age of twenty-four was 4,591. *Id.*

7. According to the 1850 U.S. Census, the population of Indiana was 988,416. *Historical Census Browser*, http://fisher.lib.virginia.edu/collections/stats/histcensus/ (last visited May 21, 2004). Of this total, the population under the age of twenty numbered 571,626. *Id.*

the subsequent problem of illiteracy among Indiana's citizens. In response to this problem, the framers of the 1851 Constitution drafted our current Article 8, Section 1. For present purposes, the most notable change between the 1816 and 1851 constitutional provisions providing for public education was the elimination of the qualifying words "as soon as circumstances will permit." [8] This made the duty imposed upon the General Assembly immediate. The striking of this provision was upon the motion of Mr. Bryant, who stated:

> "I will say that this clause was inserted inadvertently by the committee. It was not intended to retain anything more of the first section of the present Constitution, than those parts of it that were applicable to our system. We certainly did not intend to insert anything that would have the effect of preventing or postponing the establishment of *free schools*." *Debates* at 1858 (emphasis supplied).

Providing an education to *all* citizens of the State, a goal which the 1816 Constitution had failed to reach, was the goal of the framers of our current Constitution.

After the ratification of the new Constitution, the controversies arising under Article Eight mainly dealt with the issues surrounding school funding. *See e.g., Greencastle Township v. Black,* 5 Ind. 557 (1854) (local township tax to pay expenses of local common schools and the State statute which authorized such were unconstitutional because the uniformity of the common school system would be destroyed); *Adamson v. Auditor & Treasurer of Warren County,* 9 Ind. 174 (1857)

(although statutes conferring to township trustees the power to tax must be general, exercise of such power need not be uniform throughout the State); *Shepardson v. Gillett,* 133 Ind. 125, 31 N.E. 788 (1892) (rejecting claim that statute was unconstitutional which authorized trustees of incorporated towns to levy taxes for the support of town schools within their corporations); *Sch. City of Marion v. Forrest,* 168 Ind. 94, 78 N.E. 187 (1906) (stating that no question had been raised concerning the validity of statutes authorizing school boards to levy taxes for certain purposes, aside from the question as to the power to tax for tuition purposes).

In *Robinson v. Schenck,* 102 Ind. 307, 1 N.E. 698 (1885), the Court, citing *Adamson,* overruled *Maize* and *Black, supra.* The Court held that "[i]f it be true that the local authorities may be invested with authority to levy taxes to build school-houses, then it must also be true that they may be invested with authority to levy taxes to employ teachers." 102 Ind. at 317, 1 N.E. at 704. In describing the broad authority of the legislature in dealing with education, the Court stated that the only limits thereupon were that the system must be " 'a general and uniform one,' and tuition must be free and open to all." 102 Ind. at 318, 1 N.E. at 705. The Court also withdrew from the distinction drawn in *Adamson* between teacher pay and school buildings:

> "There is not the remotest implication in the Constitution authorizing the conclusion that there is a difference between the right to levy taxes for the purpose of erecting houses for the accommodation of the pupils, and the right to levy taxes to pay teachers for instructing them, and the court has no power to create

---

**8.** Other notable changes between the 1816 and 1851 constitutional provisions regarding education are the elimination of township schools in favor of a uniform system of common schools and the lack of any mention of

the state university. The change of the phrase "wherein tuition shall be gratis" to "wherein tuition shall be without charge" merely substitutes an English phrase for its Latin equivalent.

such an implication. *The act of teaching implies a place to teach as well as a teacher. Both the teaching and the place where instruction is imparted are embraced within the language of our Constitution, and the two things are so closely blended that they can not be separated.* If the teacher of a private school were to send to the father of one of his pupils an account for tuition, and afterwards a bill for the use of the place where the school was conducted, the position of the teacher would, in principle, be precisely the same as that occupied by those who affirm that the power to levy a tax to erect school-houses may be delegated, but the power to levy a tax to pay teachers can not be." 102 Ind. at 318, 1 N.E. at 704–05 (emphasis supplied).

Still, none of these early cases dealt directly with the question of what tuition without charge means.

An early case which comes close to the subject is *State ex rel. Clark v. Haworth,* 122 Ind. 462, 23 N.E. 946 (1890). *Haworth* involved a constitutional challenge under Article 1, Section 23 to a statute providing for a statewide bidding process for the procurement of textbooks.[9] Section 7 of the statute in question stated in relevant part:

"upon the receipt of such books by said school trustees they shall furnish them on demand to the school patrons or school children of their respective corporations at the price fixed therefor by the contract entered into between said board of commissioners and said contractor; and it shall be the duty of such school officers to sell such books for cash only...." *Haworth,* 122 Ind. at 492, 23 N.E. at 956 (Berkshire, J., dissenting).

In discussing this provision, the *Haworth* Court observed:

"It is to be remembered that the statute does not command that every person shall buy the books; it confines the requirement to those who receive the benefit of the public schools. These schools are owned and maintained by the state, and the state may prescribe the terms and conditions upon which pupils may enter them, except that it can not disregard the constitutional injunction that 'tuition shall be without charge, and equally open to all.'" 122 Ind. at 473–74, 23 N.E. at 949.

Thus, the *Haworth* Court was faced with a statute which required public school children to purchase books. And in discussing an attack under Article 1, Section 23, the Court took note of Article 8, Section 1, but mentioned no violation of Article 8, Section 1 by the statute requiring students to purchase textbooks. Although this could be read to suggest that the *Haworth* Court did not consider a charge for textbooks to be included within a system of free tuition, we find it significant that the *Haworth* Court was not faced with a direct challenge to the statute in question under Article 8, Section 1. Any discussion of Article 8, Section 1 was in passing and not necessary to the holding of the Court. As far as our research has revealed, *Chandler* remains the only Indiana case to have directly discussed the question of what Article 8, Section 1 means by the provision that tuition shall be without charge.

**9.** The *Haworth* Court never specifically identified under which section of the Indiana Constitution the challenge was being made. Instead, the Court referred to the "constitutional provision directed against monopolies," and also stated that "[n]o special privilege is granted to any one, no right denied to any one...." 122 Ind. at 470–71, 23 N.E. at 949. From this, we can reasonably conclude that the constitutional provision being invoked was Article 1, Section 23.

Given the historical background and purpose of Article 8, Section 1, we have our doubts with respect to the holding of *Chandler*. If the mandate of Article 8, Section 1 was to remedy the problem of widespread illiteracy and the lack of proper education among Indiana citizens, such a mandate could be easily thwarted if public schools, although not charging for "tuition" as that term was strictly construed in *Chandler*, nevertheless charged for things necessary to properly educate students. Under *Chandler*, Indiana public schools could effectively, and constitutionally, price education beyond the means of many Hoosiers.

Although the fee being charged by the EVSC is currently "only" twenty dollars, nothing in the logic of the EVSC's argument, or the *Chandler* holding, would prohibit public schools from charging a student a $200 fee, or for that matter even a $2000 fee. This logic would permit our system of public schools to be priced out of reach in order to avoid raising local taxes. It would be a cold comfort indeed to inform a Hoosier family of limited means that they could send their children to public schools without being charged for teachers' salaries, but to say that they would be charged for school buildings, heating, electricity, textbooks, etc.

We also find instructive that portion of Article 8, Section 1 which immediately follows the mandate that the common schools not charge for tuition. In context, Article 8, Section 1 states that tuition in common schools shall be without charge, "and equally open to all." Were public school students charged for everything but the strictest definition of tuition, it could hard-ly be said that the schools were truly equally open to all if the poorest of families were unable to afford these other charges.

 To be sure, *Chandler* has remained unchallenged since it was decided. Too, we do not lightly disagree with long-standing precedent. Nevertheless, in a matter relating to our state Constitution, we are not beholden to blindly follow what we consider to be an erroneous holding. We therefore conclude that, to have any forceful meaning at all, Article 8, Section 1 must be interpreted to mean that not only must Indiana public schools not charge for "tuition" in the sense of the services of a teacher or instruction, but also must not charge for those functions and services which are by their very nature essential to teaching or "tuition." *Cf. Indiana High Sch. Athletic Ass'n. v. Carlberg*, 694 N.E.2d 222, 229 (Ind.1997) (recognizing that our Constitution specifies that knowledge and learning are essential to the preservation of a free government and so mandates a "statewide system of free public education."). It is absurd to suggest that public schools may not charge for the services of a teacher, but may charge students a fee for things as essential to teaching and instruction as the services of the teacher, such as school buildings, maintenance, heating and cooling, electricity, or textbooks. To so hold, as did the *Chandler* court, leaves Article 8, Section 1 impotent and effectively meaningless. This could not have been the intent of those who drafted Article 8, Section 1 in an effort to ensure an adequate education for all Indiana citizens.[10] We are not insensitive to concerns of local officials faced with

---

10. Although we disagree with the *Chandler* court's interpretation of Article 8, Section 1, we are not today faced with a direct challenge to the constitutionality of Indiana's public school textbook scheme. Thus, despite our disagreement with its reasoning, we do not directly overturn *Chandler* for the simple reason that the issue before the *Chandler* court is not currently before us. Be that as it may, our decision makes the continued precedential value of *Chandler* dubious at best.

the difficult choice of raising taxes or cutting back on popular school programs. However, we cannot ignore what we see as the mandate of our Constitution.

There is indisputable merit to the position taken by the dissent to the extent that Judge Bailey sees the issue as one for solution by the community. We depart, however, from that view if it be limited to a particular local community or a segment thereof.

The education of the children of the State of Indiana is a concern of the State community. That is precisely why the drafters of our Constitution imposed the duty of a "general and uniform system ... wherein tuition shall be without charge and open to all."

Our holding today does not, as suggested by the dissent, necessarily require the provision of "basketballs ... trainers ... [and] soccer fields" (Dissent at 1237) at no expense to the immediate users and beneficiaries of such items, personnel, and facilities. We certainly do not imply that taxpayers must necessarily foot the bill for 10,000 seat basketball arenas, state-of-the-art concert halls, or a faculty dining room with linen tablecloths, china, and a fully staffed chef's kitchen; nor do we say that local taxpayers may not choose to pay for

such accessories or "frills" to their educational environment. Be that as it may, our holding specifically relates to only "those functions and services which are by their very nature essential to teaching or 'tuition.'" Op. at 1230. The holding itself is limited in its inclusions.

On the other hand, the dissent would limit the requirement of free education imposed by our Constitution of state-wide application to the lowest common denominator of what may be perceived to be teaching, i.e. nothing more than payment of minimum teacher's salaries to the fewest number of teachers necessary to cover the required curriculum. It would seem to provide encouragement to those among us, hopefully a very small minority, who see no value in a broadly based education and curriculum but who find adequate a teaching of "readin' writin' and 'rithmatic" without the "frills" of foreign languages, computer science, and honors programs. Such regression would be akin to a return to the one-room school house with a solitary, dedicated, but limited school-marm.[11]

We recognize that courts in our sister states have reached varying holdings with regard to questions of what may properly be charged by public schools under their constitutions.[12] *See* Jeffrey F. Ghent, *Va-*

11. We view with admiration the dissent's creative allusion to the evils sought to be visited upon the educational system of River City, Iowa by Professor Harold Hill. We find it to be somewhat misleading, however, in that it does not complete the story. Any true fan of *The Music Man* is aware that the kids did in fact receive their musical instruments as promised, learned to extract sounds from those instruments, and in marching through the town with them gained and displayed an immense sense of pride, shared, if not exceeded, by the members of the community.

12. *Compare State ex rel. Priest v. Regents of the Univ. of Wisconsin,* 54 Wis. 159, 11 N.W. 472 (1882) (state university's requirement of students to pay fee covering such expenses as

heating of public rooms, janitors to clean such rooms and students' rooms, and for various other incidental expenses did not violate statute requiring that university not charge resident students for tuition), *Segar v. Bd. of Educ. of Sch. Dist. of City of Rockford,* 317 Ill. 418, 148 N.E. 289 (1925) (school board provision requiring students to pay deposit for loaned textbooks did not violate constitutional provision for a system of free schools), *Rheam v. Bd. of Regents of Univ. of Oklahoma,* 161 Okla. 268, 18 P.2d 535 (1933) (fee imposed by university to pay for costs of student union building and stadium was not in violation of state statute prohibiting charging resident students for tuition), *Hamer v. Bd. of Educ. of Sch. Dist. No. 109,* 47 Ill.2d 480, 265 N.E.2d

*lidity of Exaction of Fees from Children Attending Elementary or Secondary Public Schools,* 41 A.L.R.3d 752, 757 (1972); 78A C.J.S. *Schools & School Districts* § 726–27 (1995); 68 Am.Jur.2d *Schools* § 238–39 (2000).

The EVSC seeks to distinguish the present situation from those cases in which various fees charged to students were held to be improper by correctly noting that in several of those cases, the constitutional language at issue called for a system of "free schools," whereas Indiana's Constitu-

tion requires that only "tuition" be without charge. As explained, however, a system whereby public schools could charge for all things outside a narrow definition of tuition could in effect render meaningless the mandate of free tuition, i.e. instruction. We also find instructive the opinion of the Supreme Court of Kansas in *Dick, supra.* In *Dick,* the plaintiffs claimed that the collection of a tuition fee violated a provision of the Kansas Constitution which at that time stated, " 'The Legislature shall encourage the promotion of intellectual,

616 (1970) (state constitutional mandate that legislature provide for a thorough and efficient system of free schools, whereby all children of the state may receive a good common school education did not prohibit legislature from authorizing local schools to purchase textbooks and rent them to students), *and Carpio v. Tucson High Sch. Dist. No. 1 of Pima County,* 111 Ariz. 127, 524 P.2d 948 (1974) (state constitutional clauses providing for general and uniform public school system and providing that system of common schools by which a free school be established and maintained in every school district did not intend to include free textbooks at the high school level), *cert. denied,* 420 U.S. 982, 95 S.Ct. 1412, 43 L.Ed.2d 664 (1975), *with Bd. of Educ. of City of Lawrence v. Dick,* 70 Kan. 434, 78 P. 812 (1904) (the term "common schools" in state constitution meant free common schools, and charge of tuition was unconstitutional), *Brinson v. Jackson,* 168 Ga. 353, 148 S.E. 96 (1929) (charging public school students matriculation fee violated state constitutional provision for common schools which " 'shall be free to all the children of the state.' "), *Dowell v. Sch. Dist. No. 1, Boone County,* 220 Ark. 828, 250 S.W.2d 127 (1952) (registration fee could not be required in public schools because of state constitutional requirement that state maintain a general, suitable, and efficient system of free schools whereby all persons in the state between the ages of six and twenty-one years may receive gratuitous instruction), *Bond v. Public Sch. of Ann Arbor Sch. Dist.,* 383 Mich. 693, 178 N.W.2d 484 (1970) (textbooks and school supplies were essential part of free education and schools could not charge for such in light of 1963 state constitutional provision for "free public elementary and sec-

ondary schools."), *Paulson v. Minidoka County Sch. Dist.,* 93 Idaho 469, 463 P.2d 935 (1970) (fee applied towards textbooks and extracurricular activities was improper given state constitutional provision requiring state legislature to establish and maintain a general and uniform system of " 'public, free common schools.' "), *Granger v. Cascade County Sch. Dist.,* 159 Mont. 516, 499 P.2d 780 (1972) (given state constitutional duty for legislature to establish and maintain a general, uniform, and thorough system of public, free, common schools, public schools could not charge students fees for those courses or activities which were reasonably related to a recognized academic and educational goal of the particular school system), *Concerned Parents v. Caruthersville Sch. Dist.,* 548 S.W.2d 554 (Mo.1977) (public schools constitutionally prohibited from charging registration and course fees as prerequisites to enrollment and to participation by school children in classes offered for academic credit in light of state constitutional provision for free public schools for gratuitous instruction), *Hartzell v. Connell,* 35 Cal.3d 899, 201 Cal.Rptr. 601, 679 P.2d 35 (1984) (imposition of fees for educational activities, including extracurricular activities, offered by a public high school violated state constitutional guarantee of " 'common schools by which a free school shall be kept up and supported in each district.' "), *and Randolph County Bd. of Educ. v. Adams,* 196 W.Va. 9, 467 S.E.2d 150 (1995) (textbooks are integral fundamental part of elementary and secondary education and must be provided to public school students without charge under state constitutional provision for a thorough and efficient system of free schools).

moral, scientific and agricultural improvement, by establishing a uniform system of commons schools....' "[13] 78 P. at 813 (quoting Kans. Const. Art. 6, Sec. 2). After quoting from several law dictionaries, the court concluded, "We think it follows, therefore, both from authority and reason, that the phrase 'common schools' was used in the Constitution in its technical sense, which means free schools...." *Id.* at 814. *See also Debates, supra,* at 1858 (referring to Article 8, Section 1 as establishing "free" schools). If common schools are synonymous with free schools, then the distinction between our constitutional provision calling for common schools wherein tuition shall be without charge, and those other states whose constitutions call for free schools, is significantly lessened.

Our conclusion that Indiana public schools are prohibited not only from charging for tuition, but also for those functions and services which are by their very nature essential to teaching or instruction, is similar to the conclusion reached in *Paulson* and *Bond, supra.* These cases held that public schools may not charge for "necessary elements of any school's activity," 463 P.2d at 938, or "integral fundamental part[s] of the elementary and secondary education." 178 N.W.2d at 488.

▮ Given our holding, the question remains: does the fee charged by the EVSC amount to a charge for tuition and those activities and functions essential to tuition? The Parents specifically complain that the fee is used to pay for the cost of elementary school counselors, school nurses, media specialists, the coordinator of student services, the alternative education program, and extra-curricular activities. The par-

ents also complain that the money generated by the fee is commingled with other monies in the EVSC's general fund. This general fund is used to pay for expenses which even under the EVSC's narrow view constitute tuition. For example, it is undisputed that teachers' salaries are paid from the general fund. According to the Parents, because of the commingling, it is impossible to tell what the fee is actually being used to pay for, i.e. tuition or non-tuition related expenses, and therefore the fee necessarily amounts to a charge for tuition.

In support of their position, the Parents refer to the deposition testimony of Robert Yeager, the assistant superintendent of personnel and finance for the EVSC. At the deposition, the Parents' counsel questioned Mr. Yeager regarding the money generated by the fee:

"Q. And what exactly is all the student fee used for? Everything it's used for, the student services fee.

A. Well, there's a list of some of the items here. *To go in and define exactly what this dollar went for and that dollar went for would be an impossibility.* What you have to do is look at the school budget and then look at the line items of the school budget. That's the only way you can see how that money is filtered out to pay for things.

Q. And the school budget then, does it show here's all the money from the student fees and here's where it's going? Is it separated out, that money?

A. *It's not separated out.*

\* \* \*

**13.** The current public school provision of the Kansas Constitution, Article 6, Section 1, states, "The legislature shall provide for intellectual, educational, vocational and scientific improvement by establishing and maintaining public schools, educational institutions and related activities which may be organized and changed in such manner as may be provided by law."

Q. Okay. What is this based on, this list [of examples of what the money generated by the fee is used for]. How do you know that this is what they're using it for?

A. Because I know that those again are items that we offer above and beyond what the core curriculum is of the school corporation.

Q. Okay. But then in addition to all of the programs and activities and personnel listed here on this list in the memorandum, there could be other things that it's used for? Is that what you're saying?

A. Well, there again *I would say that a direct correlation from dollar to dollar would be impossible to track.* In other words if you give me a $20 student fee, it goes into the pot that funds most of the school corporation. There's not specific things that say—*there's not a specific object number or function number within the accounting system that all student fees go in and therefore we only pay certain things out of it* . . . if that's the question you're trying to ask.

Q. Yes, that is.

A. Okay.

Q. Collected student service fees, they go in with the state money and the property tax money—

A. Correct.

Q. —and it's all just distributed to wherever you need it?

A. Wherever those budget line items direct it, and one of those might be school nurses. I mean, you can go

in there and you can see in the budget how much school nurses cost. If you look at that, then that's obviously one of those areas that the money could be fed into. When you put together the entire budget you look at all these different things and all these different services and personnel items, and that money becomes part of the pool to balance that part of the budget." Appendix at 102–05.

Upon appeal, the EVSC does not deny that the funds generated by the fee are commingled with other monies in the general fund.[14] However, the EVSC claims that the evidence establishes that the EVSC has not used the fee to offset costs of state mandated education, instruction, or curriculum. It is true that upon questioning by the EVSC's counsel, Mr. Yeager testified that the money generated by the fee was not "used in any way to offset any state mandated education, instruction, curriculum or service requirement." App. at 169. Mr. Yeager also testified that the fees were "solely and exclusive[ly] used to contribute to the cost of personnel or services or programs which are offered by the EVSC in addition to those required by the legislature and/or the Indiana State Board of Education." App. at 169–70.

First, that the EVSC claims that the money generated by the fee is used only towards the cost of personnel or services that are in addition to those required by the Legislature or the Board of Education is not dispositive of the issue, because under our interpretation of Article 8, Section 1, the EVSC might very well be pro-

---

**14.** Indeed, the EVSC claims that Ind.Code § 21–2–11–4 (Burns Code Ed. Supp.2003) "specifically grants EVSC authority to do so." EVSC Brief at 20. This argument misses the point. Whether a statute authorizes such is inapposite to the question of whether this practice is unconstitutional; the General Assembly cannot statutorily authorize an otherwise unconstitutional act.

hibited from charging students for costs above and beyond personnel or services that are required by the State. Those personnel and services required by the State would indeed be within the ambit of those necessary expenses for which the EVSC may not constitutionally charge students, but what is necessary under our analysis to educate students might well go beyond what is required by the State.

More importantly, however, Mr. Yeager's earlier testimony indicated that it was impossible to tell whether the money generated by the fee went to fund a specific activity. The money collected from the fee was not tracked inside the EVSC's budget. By the practice of commingling and not keeping track of the money generated by the fee, such funds lost their specific identity. *See Stevens v. Butler*, 639 N.E.2d 662, 666–67 (Ind.Ct.App.1994) (in context of claim of conversion of money, commingled funds ceased to be a separate, specifically identifiable chattel and plaintiffs no longer had a property interest in those specific funds) (citing *Kopis v. Savage*, 498 N.E.2d 1266, 1270 (Ind.Ct.App.1986)), *trans. denied.* Thus, the Parents have established that the money generated by the fee is used in some manner to pay for what amounts to tuition. This amounts to a charge for tuition in violation of Article 8, Section 1. The trial court erred in concluding otherwise, and we therefore reverse the judgment of the trial court and remand with instructions to enter summary judgment in favor of the Parents.

## II

### Due Process

In its cross-appeal, the EVSC claims that the trial court erred in granting summary judgment in favor of the EVSC upon the grounds that its policy of charging the fee to all students, including those who qualify for the reduced or free school lunch and textbook programs, amounts to a violation of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution. However, as we have concluded that the practice of charging the fee is unconstitutional as applied to all students regardless of whether they qualify for these programs, any discussion of the EVSC's due process claim would constitute dicta. We therefore need not address this issue upon appeal.

The judgment of the trial court is reversed and the cause is remanded for proceedings not inconsistent with this opinion.

ROBB, J., concurs.

BAILEY, J., dissents with opinion.

BAILEY, Judge, dissenting.

I respectfully dissent from the majority's determination that the fee policy at issue violates the Indiana Constitution. In particular, I disagree with the majority's conclusion that the word "tuition," as used in Article VIII, Section 1 of the Indiana Constitution, includes "the services of a teacher or instruction," as well as "those functions and services which are by their very nature essential to teaching or 'tuition.'" Op. at 1230. The issue before us is whether the imposition of a student activity fee—which is used to fund the following expenses: (1) the coordinator of student services; (2) elementary school counselors; (3) media specialists; (4) school nurses; (5) alternative education; (6) the police liaison program; and (7) extra-curricular activities—violates the Indiana Constitution's mandate that the General Assembly provide a "uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." *See* IND. CONST. art. VIII, § 1.

Resolution of this issue requires us to interpret the constitutional meaning of the

term "tuition." In so doing, we are bound by established doctrines of constitutional construction. "A fundamental canon of construction requires that we presume each word of the Constitution was carefully chosen and intentionally placed, '. . . as though it had been hammered into the instrument.'" *Chandler v. South Bend Cmty. Sch. Corp.*, 160 Ind.App. 592, 600, 312 N.E.2d 915, 920 (1974) (quoting *Chadwick v. City of Crawfordsville*, 216 Ind. 399, 409, 24 N.E.2d 937, 942 (1940)). In addition, we must give words employed in the Constitution their ordinary meaning, unless it affirmatively appears from the wording of the entire instrument that a contrary meaning was intended. *See Chandler*, 160 Ind.App. at 600–01, 312 N.E.2d at 920.

The term "tuition" is defined as "the act of teaching: the services or guidance of a teacher: . . . the price of or payment for instruction." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2461 (2002). This definition does not encompass expenses such as the salaries of the student services coordinator, elementary school counselors, media specialists, and school nurses, nor does it extend to the funding of programs such as police liaison, alternative education, and extracurricular activities. *See Chandler*, 160 Ind.App. at 604, 312 N.E.2d at 922 (holding that the aforementioned definition of tuition does not include textbooks). Because we must construe words according to their plain and ordinary meaning, I disagree with the majority's broad interpretation of the term tuition and, instead, favor the more narrow construction enunciated in *Chandler*.

In adopting such an expansive interpretation of the word tuition, the majority appears to be concerned that under the more narrow definition asserted in *Chandler*, public school corporations might place a price tag on education that is be-yond the means of many Hoosiers, i.e., rather than charging an activity fee of $20.00, school corporations might charge a fee of $200.00, or even $2,000.00. Op. at 1230. The majority concludes that "[i]t would be a cold comfort indeed to inform a Hoosier family of limited means that [it] could send [its] children to public schools without being charged for teachers' salaries, but to say that [it] would be charged for school buildings, heating, electricity, textbooks, etc." *Id.*

Undoubtedly, our goal as a society must be to ensure that our children enjoy the opportunity to obtain an education. In this regard, our legislature has enunciated the minimum curricula required for all Indiana elementary- and secondary-school students. *See* Ind.Code §§ 20–10.1–4–1 to –14. In so doing, the legislature has charged local school officials with financing the costs associated with this curricula— including but not limited to purchasing textbooks; employing teachers, nurses, and teacher aides performing non-instructional duties; providing a lunch program; and transporting students—by levying taxes against the local citizenry. *See* Ind. Code § 20–5–2–2; *see also* Ind.Code § 20–5–2–1.2. As such, I believe that, instead of broadening the scope of the term "tuition" beyond that intended by the framers of the Indiana Constitution, we should allow local communities to determine how best to educate their citizenry, limited only by the constitutional mandate to provide tuition, as defined in *Chandler*, free of charge. Ultimately, there are limitations on the amount of funding (whether it be taxes, sale of admission tickets, activity fees, book fees, candy sales, or corporate sponsorships to name but a few) that can be raised to educate the children of any given community. Where there are limits, choices must be made, and it is for our locally elected officials to make such choices. *See, e.g.,* Ind.Code §§ 20–5–2–

1.2, –2. While most of us would prefer a luxury ride, most of us can afford only basic transportation.

Should parents and taxpayers become disillusioned over the academic, athletic, or extracurricular offerings or the level of funding allocated to a particular program, they can confront their local officials and insist upon appropriate changes. If local school and community officials determine, for example, that athletic equipment is more important than the advancement of a foreign language program, or that the construction of a multi-million dollar athletic facility is more vital to the school's curricula than a computer lab, the local community, via the democratic process, will respond by either affirming the corporation's decision—i.e., retaining the local school and community officials—or by opposing the decision—i.e., voting the officials out of office. Though we, as a judiciary, may disagree with a community's decision to affirm or oppose the school corporation's policy, we must leave that choice to the wisdom of the local community.

Moreover, I believe that community control of education is consistent with our constitutional history, which was well developed by the majority opinion. Op. at 1226–1229. From this history, it is clear that the framers understood the benefits derived from allowing the citizenry to voice its opinion on education. Indeed, Article VIII, Section 1 of the Indiana Constitution was enacted to ensure an educated democratic society. Providing the appropriate educational opportunities for the decision makers of the future is imperative to preserve our democratic traditions. However, expanding the definition of tuition beyond that intended by the framers of our Constitution will not achieve this goal. To the contrary, expanding the definition will merely permit local school and community officials to demand more funding from the State for "tuition," thereby, providing some cover from the difficult choices required of them when confronted with a finite budget. Therefore, deciding whether to buy more books or basketballs, hire more teachers or trainers, or build more science labs or soccer fields should rest with the local authorities, and so too should the costs. Choose wrong today and the decision makers of tomorrow will be ill-equipped to fend off the modern day "Music Man." [15]

Put another way, local control of education should equate to local costs. Our state legislature has determined the minimum standards required for educating our children and has provided funding accordingly. *See* Ind.Code §§ 20–10.1–4–1 to –14. Costs over and above these minimum requirements should be funded locally through property taxes and fees, not through a subterfuge based upon an expanded definition of tuition. Unless the mechanism for funding public education in Indiana is revamped, there will continue to be a disparity of educational opportunities between the various socio-economic communities in our State. Ultimately, the responsibility to remedy these perceived disparities rests with the legislature. Accordingly, I would affirm the trial court's grant of summary judgment on this issue.

On cross-appeal, EVSC also contends that the trial court erroneously granted summary judgment to the Parents on their

---

**15.** Meredith Willson & Franklin Lacey, *The Music Man* (1962). "The Music Man" is a musical wherein a conman intends "to cheat the community with his standard scam of offering to equip and train a boy's marching band, then skip town with the money since he has no music skill anyway." *See* Kenneth Chisholm, *Plot Summary for Music Man*, *available at* http://www.us.imbd.com/title/tt0056262/ plotsummary.htm (last visited April 30, 2004).

claim that the EVSC's fee policy violates the Due Process Clause of the Fourteenth Amendment to the United State Constitution. Specifically, the trial court determined that the imposition of the twenty-dollar fee on students in the free or reduced lunch and textbook programs violates the students Fourteenth Amendment substantive due process rights. The Fourteenth Amendment to the United States Constitution provides that "no person shall be deprived of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1.

Substantive due process under the Constitution prohibits state action that deprives one of life, liberty, or property without a rational basis for the deprivation. *Parks v. Madison County*, 783 N.E.2d 711, 724 (Ind.Ct.App.2002), *trans. denied.* To determine whether the state action at issue, i.e., the fee policy, violates the United States Constitution, we first determine whether a fundamental right is affected. *Id.* In the instant case, the parties concede that the fee policy does not involve a fundamental right. Where, as here, no fundamental right is implicated, EVSC will prevail upon a showing that the policy bears a rational relationship to a legitimate state interest. *Id.*

In the present case, although EVSC has a legitimate interest in funding education and education-related services, its policy of charging a twenty-dollar fee to every student, regardless of the student's means and ability to pay such fee, is not rationally related to its superlative interest in educating its students. Indeed, for such a fee policy to survive constitutional scrutiny, it must contain, at the very least, a waiver provision for those students who cannot afford to pay the mandatory fee, potentially including but not limited to those students deemed eligible to participate in other financially subsidized programs, i.e., free or reduced lunch and textbook programs. Accordingly, I would affirm the trial court's determination that imposing the mandatory fee on students who cannot afford to pay such fee is not rationally related to EVSC's interest in raising money for school funding purposes.[16]

For these reasons, I respectfully dissent from the majority's opinion.

---

**16.** Because my resolution of this case is not dependent upon the trial court's subclass determination, I decline to address EVSC's argument that the trial court abused its discretion by certifying as a subclass the students and parents in the free or reduced lunch and textbook programs, without conducting a hearing as required by Indiana Trial Rule 23(C). *See, e.g., McCart v. Chief Executive Officer in Charge, Indep. Fed. Credit Union,* 652 N.E.2d 80, 84 n. 3 (Ind.Ct.App.1995) ("Subclasses must satisfy the class action requirements before they may be certified"), *reh'g denied, trans. denied.*