ATTORNEYS FOR APPELLANTS
Jacquelyn Bowie Suess
Kenneth J. Falk
Indiana Civil Liberties Union
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Patrick A. Shoulders
Robert L. Burkhart
Ziemer Stayman Weitzel & Shoulders, LLP
Evansville, Indiana

ATTORNEY FOR AMICUS CURIAE
INDIANA SCHOOL BOARDS ASSOCIATION
Lisa F. Tanselle
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 82S01-0409-CV-428

FRANK NAGY, ON BEHALF OF HIMSELF, HIS
CHILDREN, WESTON NAGY AND JORDAN NAGY,
AND THOSE SIMILARLY SITUATED, AND SONIA
BRACKETT, ON BEHALF OF HERSELF, HER
CHILDREN, CORY BRASHEAR AND CAMERON
BRACKETT, AND THOSE SIMILARLY SITUATED,

*Appellants (Petitioners below),*

v.

EVANSVILLE-VANDERBURGH SCHOOL
CORPORATION,

*Appellee (Respondent below).*

Appeal from the Vanderburgh Superior Court, No. 82D03-0210-PL-4388
The Honorable J. Douglas Knight, Judge

On Petition To Transfer from the Indiana Court of Appeals, No. 82A01-0308-CV-299

**March 30, 2006**

**Rucker, Justice.**

The question presented is whether the mandatory $20 student services fee imposed on students enrolled in a school corporation violates Article 8, Section 1 of the Indiana Constitution. We conclude it does.

## I. Facts and Procedural History

The facts of this case are largely undisputed. For the 2002-2003 school year, the Evansville-Vanderburgh School Corporation ("EVSC") imposed a $20 student services fee on all students in grades Kindergarten through Twelve.[1] EVSC acknowledges that the fee was imposed as part of an attempt to balance its budget, which had a $2.3 million deficit in 2002 and a predicted $5.5 million deficit for 2003. The fee, along with state funds and local property tax receipts, was deposited in EVSC's general fund and was used to pay for, among other things, a coordinator of student services, nurses, media specialists, alternative education, elementary school counselors, a police liaison program, and activities such as athletics, drama, and music. The $20 fee is charged to every student including students who qualify for the free or reduced school lunches and textbook programs. If the fee is not paid, a notice is sent to the student's parents notifying them that if payment is not received by a date certain the matter would be referred to a law firm for collection and attorney fees of up to $100 would be charged to the parent regardless of whether legal action is taken.

Frank Nagy and Sonja Brackett are residents of Evansville whose children are enrolled in public schools under EVSC's jurisdiction. EVSC charged Nagy and Brackett a $20 fee for each of their children enrolled for the 2002-2003 academic year. The Brackett children qualify for the reduced or free school lunch and textbook programs.

In October 2002, on behalf of himself and others similarly situated, Nagy filed a class action complaint seeking declaratory and injunctive relief. The complaint was later amended to

---

[1] During the 2002-2003 school year there were 23,127 students enrolled in schools under the jurisdiction of EVSC. They consisted of twenty elementary schools, ten middle schools, five high schools, and three alternative schools. Appellant's App. at 84-85.

add Sonja Brackett.[2]  Among other things the complaint alleged that the imposition of the fee violated Article 8, Section 1 of the Indiana Constitution, as well as the due process clause of Fourteenth Amendment to the United States Constitution.  EVSC responded with a motion to dismiss the Fourteenth Amendment due process claim, which the trial court initially granted.  In the meantime the parties filed cross-motions for summary judgment.  After conducting a hearing the trial court reconsidered its earlier ruling and granted summary judgment in favor of Brackett, on grounds that a fee imposed upon students who qualify for the reduced or free school lunch and textbook programs violated the due process clause of the Fourteenth Amendment.  However, the trial court granted summary judgment in favor of EVSC on Plaintiffs' Indiana Constitutional claim.  The Plaintiffs appealed and EVSC cross-appealed.

In a divided opinion, the Court of Appeals reversed the judgment of the trial court, holding that the $20 fee violates Article 8, Section 1 of the Indiana Constitution because it is used to pay for what amounts to tuition.  Because the court found the fee in violation of the Indiana Constitution, it did not reach the federal due process claim.[3]  See Nagy v. Evansville-Vanderburgh Sch. Corp., 808 N.E.2d 1221 (Ind. Ct. App. 2004).  We agree that the student services fee is inconsistent with Article 8, Section 1, but for reasons slightly different than those expressed by the Court of Appeals.  Having previously granted transfer, we now reverse the judgment of the trial court.

## II.  Discussion

### A.    Rules of Constitutional Construction

Article 8, Section 1 provides:  "Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government; it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and

---

[2] For the sake of clarity we refer to Nagy, Brackett, and additional named and unnamed plaintiffs collectively as "Plaintiffs."

[3] Noting the Court of Appeals' decision not to address the Fourteenth Amendment issue, EVSC invites this Court to "consider the federal substantive due process claim" because of its importance. Appellee/Cross-Appellant Pet. to Trans. at 13.  Deciding this case on Indiana Constitutional grounds we decline the invitation to address the federal claim.

agricultural improvement; and to provide, by law, for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all." Ind. Const. Art. 8, § 1.  Generally, questions arising under the Indiana Constitution are to be resolved by examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our Constitution, and case law interpreting the specific provisions. Ratliff v. Cohn, 693 N.E.2d 530, 534 (Ind. 1998).  As we have explained, our standard of review of state constitutional claims requires:

> a search for the common understanding of both those who framed it and those who ratified it.  Furthermore, the intent of the framers of the Constitution is paramount in determining the meaning of a provision.  In order to give life to their intended meaning, we examine the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions.  In construing the constitution, we look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy.  The language of each provision of the Constitution must be treated with particular deference, as though every word had been hammered into place.

McIntosh v. Melroe Co., 729 N.E.2d 972, 986 (Ind. 2000) (quotation marks and citations omitted).

*B.      Context of the Historical Development of Common Schools*

Exploring the framers' understanding of tuition and its application to the case before us, the Court of Appeals set forth the historical framework of Article 8, Section 1.  The Court determined that "the evil to be addressed by what became Article 8 of our Constitution was a lack of education and the subsequent problem of illiteracy among Indiana's citizens." Nagy, 808 N.E.2d at 1227-28.  From this, the Court held "that, to have any forceful meaning at all, Article 8, Section 1 must be interpreted to mean that not only must Indiana public schools not charge for 'tuition' in the sense of the services of a teacher or instruction, but also must not charge for those functions and services which are by their very nature essential to teaching or 'tuition.'" Id. at

4

1230. Accordingly the Court of Appeals determined that imposition of the $20 student services fee at issue in this case runs afoul of Article 8, Section 1. The Court also called into question the continued validity of Indiana's public textbook scheme. Id. at 1230 n.10.

We are of the view that the holding expressed by our colleagues sweeps a little too broadly. The idea that tuition includes "those functions and services which are by their very nature essential to teaching" is certainly descriptive of what is meant by a "free" school system. See, e.g., Randolph County Bd. of Educ. v. Adams, 467 S.E.2d 150, 159 (W.Va. 1995) (citations omitted) ("[W]hatever items are deemed necessary to accomplish the goals of a school system and are in fact an 'integral fundamental part of the elementary and secondary education' must be provided free of charge to all students in order to comply with the constitutional mandate of a 'free school' system."); Paulson v. Minidoka County Sch. Dist., 463 P.2d 935, 939 (Idaho 1970) (holding that schools may not charge for such items as textbooks, school building maintenance and teachers' salaries because "the common schools are to be 'free' as our constitution requires"). Indeed a number of jurisdictions contain provisions in their state constitutions for free public schools.[4] However, unlike constitutions in a number of states, the framers of Indiana's constitution were careful not to provide for a free school system.[5] Rather, at most the framers provided that tuition would be free, or more precisely "tuition shall be without charge."

---

[4] See, e.g., Ark. Const. Art. 14, § 1 ("[T]he State shall ever maintain a general, suitable and efficient system of free public schools . . . ."); Colo. Const. Art. 9, § 2 ("The general assembly shall, as soon as practicable, provide for the establishment and maintenance of a thorough and uniform system of free public schools throughout the state . . . ."); Conn. Const. Art. 8, § 1 ("There shall always be free public elementary and secondary schools in the state."); Del. Ann. Const. Art. 10, § 1 ("The General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools . . . ."); Ga. Const. Art. 8, § 1, para. 1 ("Public education for the citizens prior to the college or postsecondary level shall be free and shall be provided for by taxation."); Idaho Const. Art. 9, § 1 ("legislature of Idaho, to establish and maintain a general, uniform and thorough system of public, free common schools"); Ill. Const. Art. 10, § 1 ("Education in public schools through the secondary level shall be free."); Md. Const. Art. 8, § 1 ("The General Assembly . . . shall . . . establish throughout the State a thorough and efficient System of Free Public Schools; and shall provide by taxation, or otherwise, for their maintenance."); Mont. Const. Art. 10, § 1 ("The legislature shall provide a basic system of free quality public elementary and secondary schools."); Tenn. Const. Art. 11, § 12 ("The General Assembly shall provide for the maintenance, support and eligibility standards of a system of free public schools.").

[5] In Ind. High School Athletic Ass'n v. Carlberg, 694 N.E.2d 222, 229 (Ind. 1997), this Court observed that our state constitution "mandates a statewide system of free public education." However the issues before the Court involved a challenge to the enforcement of IHSAA transfer rules and not the interpretation of Article 8, Section 1.

5

This is a subtle distinction, but a significant one that we believe the framers made intentionally. A free public school system implies a level of educational subsidization that the framers at least did not endorse and at most rejected outright.

### 1.    The Free Common School Debate

At least one pair of commentators has noted, "The crusade for free, common schools . . . is one of the best known episodes in American educational history . . . ."  Claudia Goldin & Lawrence F. Katz, The 'Virtues' of the Past: Education in the First Hundred Years of the New Republic 16, Working Paper 9958, National Bureau of Economic Research (September 2003). Caleb Mills, a professor at what was later to become Wabash College, and often referred to as the "father of the Indiana common school system," see Scott Walter, 'Awakening the Public Mind': The Dissemination of the Common School Idea in Indiana, 1787-1852, in Hoosier Schools: Past and Present 1, 1, 8-9 (William J. Reese ed., 1998), addressed the Indiana General Assembly six times between 1846 and 1852 with appeals for the creation of free common schools.  Among other things, Mills argued for a quality education open to all Indiana children "without distinction of rank or color" and that "our common schools should be free as the atmosphere we breathe." Caleb Mills, An Address to the Legislature of Indiana at the Commencement of its Session (December 7, 1846), reprinted in Charles W. Moores, Caleb Mills and the Indiana School System 400, 404 (1905).  More particularly, Mills asserted that Indiana residents were "willing to be taxed to support Free Schools," Caleb Mills, An Address to the Legislature of Indiana, on Common Schools, Showing the Advantages of a System of General Education (December 11, 1848), reprinted in Moores, supra, at 503-04, that Indiana must "ascertain what is done in those States where *Free Schools* exist and flourish . . . to know what is necessary to accomplish," id. at 507, that good schools should include "the employment of competent teachers," id. at 515, and that Indiana should establish an office of state superintendent, id. at 521.

In apparent response to the efforts of the free common school movement supporters, the General Assembly called for a convention, to be held in Indianapolis, for the purpose of "'consulting and devising the best course to be pursued to promote common school education'" in Indiana.  Donald F. Carmony, 2 The History of Indiana 381 (1998) (quoting Indiana House

Journal 387 (1846-47)). The Indiana State Journal reported: "It is the laying [sic] the very corner stone of the durability of the republic; the commencement of a system of free schools . . . ." Carmony, supra, at 381. The convention first met on May 26, 1847 and lasted three days. Justice Blackford presided, and about 300 persons attended. Richard G. Boone, History of Education in Indiana 96 (New York, D. Appleton 1892). The convention's delegates recommended that, "(1) additional [school] funds should be provided by a general tax; (2) [the schools] should be free, 'perfectly free, as the dew of heaven, to rich and poor, without the least recognition of pauperism or charity'; (3) they should be made as good as any other schools in the State; (4) a suitable standard of qualification should be erected for teachers . . . ; [and] (5) there should be provided a superintendent of free common schools." Id. at 97. An address of the arguments emerging from the convention was produced and a thousand copies were printed and distributed across the State of Indiana. Id. at 97-98.

Still, many Indiana residents opposed free common schools.

> Even before the adjournment of the [1847-48] Legislature the campaign for free schools began, and the friends of the movement in using every agency to help it on were only equaled by its enemies in their efforts to retard it. Partisan politics, sectarian bias, the antagonisms of social classes, and personal preferences were all arrayed against the establishment of State, tax-supported schools.

Id. at 102. The Indiana House passed a bill similar in form and containing similar provisions to those recommended by the common school convention delegates. However, the Senate did not act on the bill. Instead, it submitted the question of free schools to the people of Indiana. Id. at 101. A referendum on the subject was placed on the ballot during the 1848 elections. It was straightforward: "Are you in favor of free schools?" An Act to Authorize the People to Vote for or Against a Tax for the Support of Free Schools, ch. 49, 1848 Ind. Acts 48.

There were several reported incidents of residents opposed to free common schools appearing at polls to intimidate those who would vote in favor. Boone, supra, at 103-04 (citing Indiana School Journal 298 (1876)). Some Hoosiers objected because their existence would make education too common, decreasing the value of privately funded education. Vigorous

7

opposition came from both the wealthiest and poorest economic classes—both those who had the finest education money could afford and those who never attended school. See Boone, supra, at 122-23 (explaining that rich and poor alike abhorred paying taxes for schools, the poor because they thought it unfair for the laboring classes to pay for the education of wealthy children, and the rich because they did not need the free common schools—they could enroll their children in academies). Other Hoosiers feared that a free common school system was dangerous to their religious freedom. One resident declared, "The bait is to give our children an education; the chief object is to religiously traditionize them, and then unite Church and state." Id. at 104-05. Free schooling was thought by some to be dangerous to the State and subversive to the highest individual good, and others characterized it as undemocratic.[6] Others believed a State-controlled system was a usurpation of local government authority and personal and family liberties. Id. at 108-09. Ultimately the referendum passed with 56 percent of the vote. Id. at 105-06 (providing tables of school vote by county and by region); Logan Esarey, A History of Indiana from Its Exploration to 1850 685 (1924) (containing map of Indiana with results of the referendum by county).

The 1848-49 General Assembly responded to the referendum with a legislative enactment to "increase and extend the benefits of the common schools." An Act to Increase and Extend the Benefits of Common Schools, ch. 116, 1849 Ind. Acts 123. Although the new act addressed aspects of school funding, it stopped far short of establishing free schools. See id. at § 31. It was in this environment—a lively and sometimes acrimonious public debate over the establishment of free common schools and a referendum vote of 56% in support of free common schools—that the framers of Indiana's second constitution assembled at Indianapolis on October 7, 1850.

2.      The Constitutional Convention

Drafted in 1816, Indiana's first constitution provided the following provisions concerning education:

> Sect. 1st. Knowledge and learning generally diffused, through a community, being essential to the preservation of a free

---

[6] One unidentified member of the 1847 General Assembly exclaimed: "When I die I want my epitaph written, 'Here lies an enemy to free schools.'" Boone, supra, at 87.

Government, and spreading the opportunities, and advantages of education through the various parts of the Country, being highly conducive to this end, it shall be the duty of the General Assembly to provide, by law, for the improvement of such lands as are, or hereafter may be granted, by the [U]nited States to this state, for the use of schools, and to apply any funds which may be raised from such lands, or from any other quarters to the accomplishment of the grand object for which they are or may be intended.  But no lands granted for the use of schools or seminaries of learning shall be sold by authority of this state, prior to the year eighteen hundred and twenty; and the monies which may be raised out of the sale of any such lands, or otherwise obtained for the purposes aforesaid, shall be and remain a fund for the exclusive purpose of promoting the interest of Literature, and the sciences, and for the support of seminaries and public schools.  The General Assembly shall from, time to time, pass such laws as shall be calculated to encourage intellectual, Scientific, and agricultural improvement, by allowing rewards and immunities for the promotion and improvement of arts, sciences, commerce, manufactures, and natural history; and to countenance and encourage the principles of humanity, honesty, industry, and morality.

Sect. 2.  It shall be the duty of the General [A]ssembly, *as soon as circumstances will permit*, to provide, by law, for a general system of education, ascending in a regular gradation, from township schools to a state university, *wherein tuition shall be gratis*, and equally open to all.

Ind. Const. of 1816, art. 9, §§ 1-2, reprinted in 1 Charles Kettleborough, Constitution Making in Indiana: A Source Book of Constitutional Documents with Historical Introduction and Critical Notes 112-14 (1916) (emphasis added).  The second constitutional convention consisted of 150 delegates.  James H. Madison, The Indiana Way – A State History 139 (1986).  For purposes of considering, drafting, and submitting sections to be incorporated into the new constitution, the convention was divided into twenty-two standing committees.  Kettleborough, supra, at 221.  On October 14, 1850, a ten-person Committee on Education was formed.  To that committee was referred, among other things, the educational provision of the 1816 Constitution.  On December 11, 1850 the committee reported the results of its deliberations to the full convention, which included a recommendation that the following provision be adopted:

9

> Sec. 1. Knowledge and learning generally diffused through a community being essential to the preservation of a free government, it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement, and to provide by law for a general and uniform system of common schools, wherein tuition, as soon as circumstances will permit, shall be gratis, and equally open to all.

Journal of the Convention of the People of the State of Indiana to Amend the Constitution 407-08 (Indianapolis, A.H. Brown 1851) [hereinafter Journal]. The proposed section was read a first time and passed to a second reading. Id. at 409.

At the time of the second reading, on January 27, 1851, committee member James R.M. Bryant of Warren County noted a discrepancy between the proposed text and the intended proposal of the committee. Realizing that the proposed provision contained the clause "as soon as circumstances will permit," delegate Bryant declared: "I will say that this clause was inserted inadvertently by the committee. It was not intended to retain anything more of the first section of the present Constitution, than those parts of it that were applicable to our system. We certainly did not intend to insert anything that would have the effect of preventing or postponing the establishment of free schools." 2 Report of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Indiana 1858 (Indianapolis, A.H. Brown 1851) [hereinafter Debates]. See also Journal, supra, at 801. The delegates agreed with Bryant's motion to remove the clause from the provision, and the revised section was set for a third reading. Debates, supra, at 1858; Journal, supra, at 801.

On January 28, 1851, Bryant reminded the convention delegates of recent developments in Indiana education and corresponding legislative responses.[7] Debates, supra, at 1888-91. Quoting from the 1850 census, Bryant argued that more than 73,299 Indiana citizens over the age of twenty-one were illiterate. Id. at 1890-91. He then highlighted the 1848 passage of the free public school question in the referendum and the decision of more than sixty Indiana counties to establish systems of free schools with a "limited tax." Id. After a third and final reading on January 30, the provision passed without further discussion and was referred to the

---

[7] In addition Bryant argued against diverting money from Indiana's public university fund, also a point of contention during the second constitutional convention. Debates, supra, at 1888-91.

Committee on Revision, Arrangement, and Phraseology. Journal, supra, at 815. When the committee submitted its report on February 7, Article 8, Section 1 had been slightly modified from "shall be gratis" to "shall be without charge," which apparently reflected a change from a Latin phrase to its English equivalent. The full text read as follows:

> Sec. 1. Knowledge and learning generally diffused throughout a community, being essential to the preservation of a free government, it shall be the duty of the General Assembly to encourage, by all suitable means, moral, intellectual, scientific, and agricultural improvement; and to provide by law for a general and uniform system of Common Schools, wherein tuition shall be without charge, and equally open to all.

Id. at 945. Ultimately the delegates completed their work on February 10, 1851. After ratification by the voters, the Constitution took effect November 1, 1851. Kettleborough, supra, at 425.

*C.      Application of Section 1 to the School Activity Fee*

Despite delegate Bryant's comments that the committee did not intend to insert anything that would have the effect of preventing or postponing "the establishment of *free* schools" (emphasis added), the text of the provision itself was far short of such a declaration. Rather than completely subsidizing education, which would fall within the meaning of a "free school" system, the framers pursued a more modest, and perhaps less controversial, route: a uniform statewide system of public schools that would be supported by taxation. Indeed the term "common school" was widely understood to mean "public school." See State v. O'Dell, 187 Ind. 84, 118 N.E. 529, 530 (1918) (declaring that the phrase "common schools" is synonymous with "public schools" and includes high schools); Embry v. O'Bannon, 798 N.E.2d 157, 162 n.4 (Ind. 2003) (quoting Noah Webster, An American Dictionary of the English Language 988 (Springfield, Mass., Merriam 1856) [hereinafter Webster 1856]) (noting that a "common school" is one that is "open to the children of all the inhabitants of a town or district"); see also Goldin & Katz, supra, at 11 (observing that the term "common school" was not so much a phrase meant to imply a free school but rather was a term "used in opposition to a private school, either secular or denominational"). In fact, "[t]he original common schools in America were not 'free,' since parents had to pay tuition in the form of 'rate bills.'" Edwin G. West, The Rise of the State in

11

Education, <u>Policy: A Journal of Public Policy and Ideas</u> 59, 60 (1991).  The rate bill was a fee charged to parents for sending their children to public school.

> By the mid-19th century, American fee-paying common schools had become numerically dominant partly because of land grants that enabled them to charge lower tuition fees than private schools.  The latter, being largely denominational establishments, were precluded from such publicly-provided advantages.  Enjoying this differential cost advantage, the common schools eventually became widespread and numerous . . . .  [T]heir access to tax revenues ultimately enabled them to abolish the fees.

<u>Id.</u> at 61.  The rate bill was abolished in Indiana in 1852, shortly after the 1851 constitution was ratified.  <u>See</u> Goldin & Katz, <u>supra</u>, Table 4.1.

We observe that other than arguments concerning the funding of public schools there is nothing in the <u>Journal</u> or <u>Debates</u> of the second constitutional convention concerning what the framers meant by the use of the term "tuition."[8]  However this is not surprising in that the historical record suggests that the term was neither technical nor particularly controversial.  For example a period dictionary defines tuition as:

> 1.  Guardianship; superintending care over a young person; the particular watch and care of a tutor or guardian over his pupil or ward.
> 2. *More especially*, instruction; the act or business of teaching the various branches of learning.  We place our children under the preceptors of academies for *tuition*.  [*This is now the common acceptation of the word*.]
> 3.  The money paid for instruction.  In our colleges, the *tuition* is from thirty to forty dollars a year.

---

[8] The delegates devoted significant time to deliberations regarding a proper and practicable manner to manage and distribute resources committed to funding public education.  <u>See</u> <u>Debates</u>, <u>supra</u>, at 1079-80 (regarding the condition of school funds); <u>id.</u> at 1900-01 (proposed section to require school funds to be distributed to the counties according to the number of schools in the counties; proposal to fund libraries with school funds); <u>id.</u> at 1973 (proposal to permit the General Assembly to invest the common school fund in state-issued bonds); <u>id.</u> at 1861 (motion that no school district will be deprived of its share of school funds for want of a school house or any other reason); <u>id.</u> at 1880-83 (debating the proper management of funds committed to common schools); <u>see also</u> <u>id.</u> at 1858-60 (discussion regarding the establishment of an office of the superintendent of public instruction).

Noah Webster, An American Dictionary of the English Language 1181 (Springfield, Mass., Merriam 1854) (emphasis in original).[9] The common understanding of the term "tuition" by those who framed the constitution as well as those who ratified it would have been consistent with the forgoing definition.

Arguing that tuition contemplates only fees for instruction, EVSC insists that "[e]xpenses incidental to credited, academic instruction such as heat, light, facility maintenance, non-instructional salaries/stipend do not fall within the commonly understood definition of 'tuition.'" Br. of Appellee/Cross-Appellant at 13. EVSC suggests that other than legislatively-mandated curriculum requirements all other educationally related expenses may be assessed against students and their parents.

We agree in principle with EVSC's understanding of tuition as the term is used in Article 8, Section 1. This understanding is also consistent with the definition of tuition expressed in Chandler v. South Bend Cmty. Sch. Corp., 160 Ind. App. 592, 312 N.E.2d 915, 920 (1974). However the analysis does not end there. It is certainly the case that at the time the 1851 constitution was adopted the expenses associated with a public education were modest by today's standards, consisting primarily of school buildings—usually one-room schoolhouses—their maintenance, desks, textbooks, supplies, and teacher salaries. By the express terms of the Constitution, "tuition shall be without charge." Obviously tuition was to be subsidized through public funding sources. But to suppose that all remaining educational expense would be placed on the shoulders of parents whose children were attending public schools loses sight of the entire free school movement debate—a central and key element of which was that public schools would be operated largely at public expense. Indeed within three years of the Constitution's ratification this court noted that "the evils of the old system which were intended to be avoided by the new constitution—[were] inequality in education, inequality of taxation, lack of

---

[9] See also Webster 1856, supra, at 1181; John Borg, The Imperial Lexicon of the English Language 612 (New York, Fullarton 1850) (defining "tuition" as "*More especially*, instruction; the act or business of teaching the various branches of learning. The money paid for instruction.") (emphasis in original); William C. Anderson, A Dictionary of Law 1064 (Chicago, T.H. Flood & Co. 1893) (defining "tuition" as "ordinarily restricted to the fee or fees paid for instruction, and not to charges made to meet incidental expenses").

uniformity in schools, and a shrinking from legislative responsibilities . . . ." <u>Greencastle Twp. in Putnam County v. Black</u>, 5 Ind. 557, 564 (1854), <u>overruled in part by</u> <u>Robinson v. Schenck</u>, 102 Ind. 307, 1 N.E. 698 (1885).[10]

It is of course true that what constitutes a public education has dramatically expanded over these several decades. We doubt for example that the framers could have had in their contemplation such cost items as computer labs, athletic departments, and media specialists. But it is equally true that determining the components of a public education is left within the authority of the legislative branch of government. Article 8, Section 1 imperatively places upon the legislature, "by all suitable means . . . to provide, by law, for a general and uniform system of Common Schools." But this imperative leaves to that branch considerable discretion in determining what will and what will not come within the meaning of a public education system. "The duty rests on the legislature to adopt the best [school] system that can be framed; but they, and not the courts, are to judge what is the best system. There is this limitation on the legislative power: the system must be 'a general and uniform one,' and tuition must be free and open to all; but the extent of this limitation is this, and nothing more." <u>Robinson</u>, 1 N.E. at 705.

Consistent with its constitutional mandate, the Indiana General Assembly has enacted a body of law directed at providing a general and uniform system of public schools. It is detailed, comprehensive, and includes among other things provisions for revenue and funding sources, curriculum requirements, and an assortment of special programs and projects. <u>See generally</u> Titles 20 and 21 of the Indiana Code. In addition, the legislature has delegated to the State Board of Education the authority to adopt rules concerning several matters, including "the distribution of funds and revenues appropriated for the support of schools in the state," I.C. § 20-19-2-8(a)(7), and has authorized the State Board to "[e]stablish the educational goals of the state,

---

[10] Evansville's schools have a particular connection to the adoption of Article 8. Soon after the 1851 constitution took effect, this Court held that it was unconstitutional to levy local taxes for the operation of schools, in a unanimous opinion by Justice Alvin Hovey of Posey County. <u>Greencastle</u>, 5 Ind. at 563. One effect of this holding was to prompt the temporary closing of New Albany High School, making today's Evansville Central High School the "oldest free public high school in continuous operation west of the Alleghenies." Patricia Swanson, <u>Central High School</u>, <u>Evansville Courier & Press</u>, Sept. 22, 2004, at 1.

developing standards and objectives for local school corporations." I.C. § 20-19-2-14.[11] Under this grant of authority the State Board of Education has promulgated numerous rules outlining those components of education in Indiana that are a part of "public" education. They too are detailed and comprehensive. See generally Title 511 of the Indiana Administrative Code.

Where the legislature—or through delegation of its authority the State Board—has identified programs, activities, projects, services or curricula that it either mandates or permits school corporations to undertake, the legislature has made a policy decision regarding exactly what qualifies as a part of a uniform system of public education commanded by Article 8, Section 1 and thus what qualifies for funding at public expense. And of course the legislature has the authority to place appropriate conditions or limitations on any such funding.[12] However, absent specific statutory authority, fees or charges for what are otherwise public education cost items cannot be levied directly or indirectly against students or their parents. Only programs, activities, projects, services or curricula that are outside of or expand upon those identified by the legislature—what we understand to be "extracurricular"—may be considered as not a part of a publicly-funded education. And thus a reasonable fee may be assessed, but only against those students who participate in or take advantage of them.

In this case the $20 fee that EVSC imposes on all students is deposited into its general fund and is used to offset the costs of such things as: a coordinator of student services, nurses, media specialists, alternative education, elementary school counselors, a drama program, a music program, speech and debate programs, academic academies, athletic programs, and a police liaison program. See Appellant's App. at 21. But either the legislature or the State Board has already determined that all such items are part and parcel of a public school education and by

---

[11] "[The legislature] routinely delegates to agencies the power to make major policy decisions in the form of rules of conduct that bind all citizens. When [a legislative body] delegates authority to an agency, it accompanies that grant of power with substantive standards." State Bd. of Tax Comm'rs v. Indianapolis Racquet Club, Inc., 743 N.E.2d 247, 251 (Ind. 2001) (quoting 1 Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 2.6, 67 (3d ed. 1994)).

[12] See, e.g., 511 IAC 7-17-7 (providing that in the area of special education, incidental fees may be charged to students or their parents which "may include but are not limited to . . . (1) Textbook rental. (2) Consumable materials. (3) Extracurricular activities."). See also I.C. § 20-26-5-4(12) (formerly I.C. § 20-5-2-2(11)) (providing authority for school corporations to operate a textbook rental program).

15

extension qualify for public funding. For example public schools are required to provide student assistance services and to employ a qualified coordinator, see 511 IAC 4-1.5-5, provide health services and employ at least one registered nurse, see 511 IAC 4-1.5-6, and have a media program and employ a licensed media specialist, see 511 IAC 6.1-5-6. A school corporation is authorized to establish an alternative education program. See I.C. § 20-30-8-1 to -14. Elementary schools must have a school counselor for every six hundred students enrolled in grades one through six in the school corporation. See 511 IAC 4-1.5-2(b)(1). Public schools are encouraged to develop comprehensive plans to improve arts education, which includes programs in drama and music, see I.C. § 20-20-24-1 to -6, and are permitted to offer speech and debate as a part their language arts area of study, see 511 IAC 6.1-5.1-2. As for the "academic academies" the record shows these are after-school enrichment programs most of which "deal with the same type of information that's worked in through the school day," Appellant's App. at 143-44, and we have already recognized that "athletics are an integral part of this constitutionally-mandated process of education." Carlberg, 694 N.E.2d at 229. See I.C. § 21-2-11-4(b) (permitting athletic coaches to be paid from a school corporation's general fund); I.C. § 20-26-14-1 (permitting interscholastic high school athletic events); I.C. § 20-30-15-6 (permitting schools to employ personnel to supervise athletics). Concerning the Police Liaison Program, it is not altogether clear from the record exactly what this program entails. We know that it is designed to improve safety and security at schools. See Appellant's App. at 130-31 (under the police liaison program, schools "work . . . in conjunction with the city police and the juvenile division," who are not employees of the school corporation and "who assist and help with problems that are law enforcement related at the schools."). But the legislature has established an Indiana safe schools fund to allow public schools to promote school safety by designating a school safety specialist, training school personnel, purchasing security equipment, and using dogs trained to detect firearms and illegal substances. See generally I.C. § 5-2-10.1-0.3 to -12.

In essence, the very programs, services, and activities for which EVSC charges a fee already are a part of a publicly-funded education in the state of Indiana. However, this conclusion does not preclude EVSC from offering programs, services or activities that are outside of or expand upon those deemed by the legislature or State Board as part of a public education. The Indiana Constitution does not prohibit EVSC from charging individual students

for their participation in such extracurriculars or for their consumption of such services. However the mandatory fee EVSC imposed generally on all students, whether the student avails herself of a service or participates in a program or activity or not, becomes a charge for attending a public school and obtaining a public education. Such a charge contravenes the "Common Schools" mandate as the term is used in Article 8, Section 1 and is therefore unconstitutional.

## Conclusion

We reverse the judgment of the trial court and remand this cause for further proceedings.

Shepard C.J., and Dickson and Boehm, JJ., concur.
Sullivan, J., dissents with separate opinion.

17

**Sullivan, Justice, dissenting.**

Justice Rucker has produced a scholarly and erudite recounting of the history of Article 8, Section 1, of the Indiana Constitution from which we will all benefit. Particularly interesting (and important) is the Court's account of the historical distinction between "free schools" and "[s]chools . . . wherein tuition shall be without charge."

The Court holds that under Article 8, Section 1, the legislature has the power and authority to determine "what qualifies as a part of a uniform system of public education commanded by Article 8, Section 1 and thus what qualifies for funding at public expense." Slip op. at 14. This authority, according to the Court, includes the power to "place appropriate conditions or limitations on any such funding," such as textbook rental fees, and to authorize "fees or charges for what are otherwise public education cost items." Id. at 14-15 & n.12 (emphasis supplied).

And the Court determines that a school may assess a reasonable fee that is imposed absent specific statutory authority for those things "that are outside of or expand upon those identified by the legislature" as part of the constitutionally commanded uniform system of public education. Id. at 15.

The Court goes on to conclude that the fee at issue here violates these principles because the costs it offsets are for items that the legislature has identified as public education cost items. But the trial court made the following findings of fact[13] with respect to these items:

> 13.   EVSC imposed the Fee in order to balance its budget and so that EVSC could continue to offer programs that are not state-funded or state required and that enrich students' lives and to provide additional educational related options that do not hurt the integrity of EVSC's core curriculum. . . .

---

[13] The plaintiffs do not contend that the evidence does not support these findings, only that they are erroneous conclusions of law. See Br. of Appellants at 19 n.15.

17.     The Fee proceeds are not used by EVSC to offset state mandated education, instruction, curriculum or service requirements. . . .

20.     The Fee proceeds are used solely by EVSC to contribute to the cost of personnel, or services or programs which are offered by EVSC in addition to those required by the Indiana General Assembly and/or Indiana State Board of Education. . . .

App. at 20-21.  Because the trial court found that the things for which the fee was imposed were things that, to use the Court's formulation, were "outside of or expand[ed] upon those identified by the legislature" as part of the constitutionally commanded uniform system of public education, I believe that even under the Court's construction of Article 8, Section 1, the fee was permissible.